**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| **IN RE:**<br><br>**BK RACING, LLC**<br><br>      **Debtor.** | **CASE NO.  18-30241**<br><br>**CHAPTER 11** |

**OBJECTION OF UNION BANK & TRUST TO DEBTOR'S EMERGENCY MOTIONS
FOR ORDER AUTHORIZING I) THE USE OF CASH COLLATERAL PURSUANT TO
SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE; II) THE PAYMENT OF
<u>PRE-PETITION PAYROLL AND PAYROLL TAXES</u>**

Union Bank & Trust ("<u>UBT</u>"), a senior secured creditor in the above-captioned Chapter 11 case, hereby objects to the Emergency Motions for Order Authorizing I) the Use of Cash Collateral Pursuant to Sections 361 and 363 of the Bankruptcy Code; II) the Payment of Pre-petition Payroll and Payroll Taxes filed on February 23, 2018 (Doc. 28) (the "<u>Motion</u>") filed by Debtor BK Racing, LLC (the "Debtor"). In support of this Objection, UBT respectfully represents and states as follows:

**<u>JURISDICTION</u>**

1.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**<u>BACKGROUND</u>**

2.       The Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on February 15, 2018 (the "<u>Petition Date</u>").  The Debtor continues in possession of its assets and the management of its business and affairs as a debtor in possession pursuant to Bankruptcy Code § 1107 and 1108.

10644996

3.      The Debtor owns and operates a Monster Energy NASCAR Cup Series Toyota Racing team currently racing the No. 23 car (the "Race Team"). As of the Petition Date, the Debtor's principal place of business and garage facility for the Race Team was located in Harrisburg, North Carolina.

4.      Before the Petition Date, UBT loaned more than $12,000,000 to Ronald C. Devine, who owns directly or indirectly through certain of his affiliates approximately 75% of the Debtor ("Devine"), and a related entity.  Those loans by UBT to Devine (collectively, the "Loans") were evidenced by promissory notes, true and correct copies of which are attached hereto as Exhibit A.

5.      Before the Petition Date, the Debtor guaranteed the obligations under the Loans pursuant to written guaranties executed by the Debtor in favor of UBT, true and correct copies of which are attached hereto as Exhibit B.

6.      Before the Petition Date, the Debtor executed written security agreements in favor of UBT pursuant to which the Debtor granted to UBT a first-priority security interest in all of its assets, whether then existing or thereafter acquired by the Debtor, including without limitation the following (collectively, the "Collateral"):

   (a)    That certain NASCAR Cup Series Charter Member Agreement 32, dated as of February 8, 2016 (relating to the assigned No. 23 car as of that date), by and among the Debtor, Devine, NASCAR Event Management, Inc. and other named NASCAR entities  ("CMA 32");

   (b)    That certain NASCAR Cup Series Charter Member Agreement 33, dated as of February 8, 2016 (relating to the assigned No. 83 car as of that date), by and among the Debtor, Devine, NASCAR Event Management, Inc. and other named NASCAR entities ("CMA 33");

   (c)    All of the Debtor's titled vehicles, including tractors, trailers, trucks and other vehicles used in its motor sports business;

   (d)    All of the Debtor's goods, equipment, tools, machinery, furnishing and all other personal property associated with its motor sports business;

        (e)      All of the Debtor's general intangibles and other assets associated with its motor sport business;

        (f)      All of the Debtor's accounts maintained at UBT; and

        (g)      All products and produce of any of the foregoing;

        (h)      All proceeds from the sale, destruction, loss or other disposition of the property described above. [1]

True and correct copies of the Debtor's security agreements are attached hereto as Exhibit C.

7.      UBT caused to be filed and properly recorded in the Office of the North Carolina Secretary of State a UCC1 financing statement and a UCC3 financing statement (collectively, the "UBT Financing Statements") evidencing and perfecting its liens on the Collateral, true and correct copies of which are attached hereto as Exhibit D.

8.      Upon information and belief, more than $5 million in proceeds of the Loans were delivered to the Debtor, including more than $3 million in such proceeds when the Debtor executed its guaranty and security agreement in May 2016, and UBT released, upon the joint request of Devine and the Debtor, an additional $800,000 in cash collateral that UBT had been holding to secure the Loans.

9.      By reason of the foregoing, all income and revenue generated by the Debtor and the Race Team, whether in the form of income, revenue from NASCAR (whether paid to the Debtor under or in connection with CMA 32 or otherwise), sponsorship funds (cash or non-cash), and all other receipts are UBT's cash collateral (the "Cash Collateral").

10.     Promptly after the Petition Date, UBT advised the Debtor in writing that it did not consent to the Debtor's use of Cash Collateral, although UBT informed the Debtor that it would

---

[1] The description of the Collateral set forth in this Objection is a summary description of the assets in which he Debtor has granted UBT a security interest and upon which UBT has a duly-perfected lien. The summary description is provided for the convenience of the Court and does not limit, prejudice or otherwise impair UBT's claims, rights or remedies with respect to the Collateral as more particularly set forth in the security agreements or the UBT Financing Statements (as defined in Paragraph 7 of this Objection).

consider terms proposed by the Debtor pursuant to which UBT would consent to the Debtor's use of Cash Collateral.

11.     As of the Petition Date, UBT was owed, in connection with the Loans, principal of $8,496,968.22, interest at the non-default rate of nearly $297,000, late charges of nearly $646,500, plus other fees and charges under the documents evidencing the Loans (including attorneys' fees). The per diem interest accrual on the Loans at the non-default rate is $924.52.

12.     The Court conducted an interim hearing on February 22, 2018, on less than three (3) hours' notice, with respect to the Motion as it relates to the Debtor's use of Cash Collateral to pay the pre-petition wages claims and related payroll obligations, all as shown on the exhibit attached to the Debtor's Motion and presented to the Court at the interim hearing. UBT, therefore, will focus its Objection on the other relief requested by the Debtor in the Motion.

## **OBJECTION**

13.     Bankruptcy Code § 363(a) defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

Accordingly, the Cash Collateral constitutes "cash collateral" as defined in the Bankruptcy Code.

14.     As noted above, UBT has a first-priority security interest in the Cash Collateral. The post-petition effect of UBT's security interest is governed by Bankruptcy Code § 552(b)(1), which states:

(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits by the estate after the commencement of the case to the extent provided in such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

15.     UBT's security interest over the Cash Collateral stems from pre-petition security agreements encumbering the Collateral, which documents specifically provide that the lien extends to "products and produce" of the Collateral and "all proceeds" from the sale, destruction, loss or other disposition of the Collateral. Thus, pursuant to Bankruptcy Code § 552(b)(1), UBT's first-priority security interest in the Collateral extends post-petition to the Cash Collateral. *See In re Bumper Sales, Inc.*, 907 F.2d 1430, 1432 (4th Cir. 1990) (holding, under § 552(b)(1), that lender's security interest in debtor's inventory, accounts receivable and other property and "the proceeds from said collateral" extended to debtor's post-petition assets, which were proceeds of the debtor's pre-petition assets); *In re Hard Rock Expl., Inc.*, No. 2:17-BK-20459, __ B.R. __, 2017 WL 6507836, at \*12 (Bankr. S.D.W. Va. Dec. 18, 2017) (applying § 552(b)(1) and holding that lender's lien on certain collateral and "proceeds and products" of that collateral extended to post-petition "proceeds and products" of collateral).

16.     Similarly, because UBT's security interest over the Cash Collateral stems from pre-petition security agreements encumbering the Collateral, which agreements specifically provide that the lien extends to "products and produce" of the Collateral, UBT's lien also extends to the post-petition rent generated by such property pursuant to Bankruptcy Code § 552(b)(2), which states, in its pertinent parts, that:

> ...[I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 USCS § 552(b)(2).

17.     Based on the foregoing, the post-petition income and revenue arising from the Debtor's use of the Collateral constitute part of UBT's Cash Collateral in accordance with § 552(b), and UBT has a valid lien over all of the Cash Collateral for which Debtor has not obtained prior Court approval or the consent of UBT for its use.

18.     A party with an interest in cash collateral is entitled to adequate protection of that interest pursuant to Bankruptcy Code §§ 361 and 363(e).  Section 363(e) states that "the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

19.     Pursuant to Bankruptcy Code § 363(e), any authorized use of the Cash Collateral must be conditioned upon the Debtor's provision to UBT of adequate protection for its interest in the Cash Collateral.

20.     UBT objects to the Motion and the Debtor's request to use cash collateral on an interim basis unless the Court provides UBT the following adequate protection:

> (a)     Require the Debtor to make by 5:00 p.m. prevailing Charlotte time each Monday an adequate protection payment - $6,500 per week;
>
> (b)     Require the Debtor to deliver to UBT a detailed budget by week for each of the 36 weeks in the 2018 NASCAR Monster Energy race season;

(c)     Require the Debtor to deliver to UBT a detailed weekly budget in form reasonably acceptable to UBT setting forth a line item for each category of income or revenue (*e.g.*, prize money, sponsorship and other) and for each category of expenses (*e.g.*, payroll, payroll-related taxes, other payroll-related expenses, driver payment, payments for the pit crew, engine lease, tire purchase, fuel for the Race Team, fuel for the haulers of the Debtor's equipment, rental of pit equipment, hotels, rental cars, airfare, per diem, meals, other travel-related expenses, advertising, competition entry fees, other NASCAR credential-related expenses, insurance, equipment rent, real property rent and any other expenses), to be delivered by 5:00 p.m. prevailing Charlotte time each Monday for the week beginning at 12:00 a.m. that Monday and ending at 11:59 p.m. the following Sunday;

(d)     Require the Debtor to deliver to UBT a detailed report for the previous week in a form consistent with the weekly budget set forth above reflecting (i) actual income, revenues and expenses, (ii) budgeted income, revenues and expenses and (iii) the amount of variance for each category set forth thereon, to be delivered by 5:00 p.m. prevailing Charlotte time each Monday;

(e)     Require the Debtor to deliver to UBT a detailed cumulative report for the post-petition time period in a form consistent with the weekly budget set forth above reflecting (i) actual income, revenues and expenses, (ii) budgeted income, revenues and expenses and (iii) the amount of variance for each category set forth thereon, to be delivered by 5:00 p.m. prevailing Charlotte time each Monday;

(f)     Require the Debtor to deliver to UBT a detailed weekly cash receipts report reflecting prize money, other NASCAR payments, sponsorship funds, other income, loans and capital contributions, to be delivered by 5:00 p.m. prevailing Charlotte time each Monday for the week beginning at 12:00 a.m. that Monday and ending at 11:59 p.m. the following Sunday;

(g)     Require the Debtor to deliver to UBT a detailed weekly cash disbursements report to be delivered by 5:00 p.m. prevailing Charlotte time each Monday for the week beginning at 12:00 a.m. that Monday and ending at 11:59 p.m. the following Sunday;

(h)     Require the Debtor to deliver to UBT a report (or print-out from the bank at which the Debtor has its debtor in possession accounts) showing all transactions with respect to such accounts, to be delivered by 5:00 p.m. prevailing Charlotte time each Monday for the week beginning at 12:00 a.m. that Monday and ending at 11:59 p.m. the following Sunday;

(i)     Require the Debtor to deliver to UBT by March 5, 2018, a copy of each written sponsorship or partnership agreement between the Debtor and any of its sponsors or partners existing as of February 28, 2018;

(j)     If the Debtor enters into any such sponsorship or partnership agreement after February 28, 2018, require the Debtor to deliver to UBT a copy of each such agreement within 48 hours of execution thereof;

(k)     If the Debtor does not have or enter into any written sponsorship or partnership agreement as described above, require the Debtor to deliver to UBT information relating to each sponsorship or partnership in sufficient detail to enable UBT to determine the name of the sponsor or partner, the consideration received or to be received by the Debtor, the timing of such consideration and the term of such agreement and any documents or written communications relating thereto;

(l)     Require the Debtor to deliver to UBT a copy of the Debtor's actual historical financial information for 2017 consistent in form and substance with the financial information provided by the Debtor to UBT for 2015 and 2016, certified by the Debtor;

(m)    Require the Debtor to deliver to UBT a detailed income statement/profit and loss statement (on an accrual basis) for 2017 consistent in form and substance with the financial information provided by the Debtor to UBT for 2015 and 2016, certified by the Debtor;

(n)     Require the Debtor to deliver to UBT a detailed balance sheet as of December 31, 2016 and December 31, 2017, consistent in form and substance with the financial information provided by the Debtor to UBT for 2015;

(o)     Require the Debtor to deliver to UBT a copy of its income tax returns for 2015 and 2016;

(p)     Require the Debtor to deliver by wire or electronic funds transfer to the trust account of its counsel all income and revenues, other than funds necessary to pay, when due, the expenses reflected on the weekly budgets previously delivered, with such transfer to be completed within one business day of the Debtor's receipt thereof; and

(q)     Provide UBT a replacement lien on the Debtor's post-petition assets for any diminution in value and a super priority claim under 11 U.S.C. §507(b) to the extent the adequate protection granted proves to be inadequate.

21.     This Objection is without prejudice and shall not constitute a waiver by UBT of its rights to seek adequate protection, or other or additional relief from the Court as the circumstances may dictate, including without limitation the appointment of a Chapter 11 trustee.

WHEREFORE, UBT respectfully objects to the Debtor's request to use cash collateral unless UBT receives adequate protection consistent with this Objection and such other and further relief as is just and proper.

This 26th day of February, 2018.

/s/ David M. Schilli
David M. Schilli
N.C. State Bar No. 17989
dschilli@robinsonbradshaw.com
Stuart L. Pratt
N.C. State Bar No. 43139
spratt@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.

101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
704.377.2536
704.378.4000 (fax)

*Attorneys for Union Bank & Trust*

Annemarie DiNardo Cleary
(Va. State Bar No. 28704)
(*pro hac vice* pending)

*Attorneys for Union Bank & Trust*

ECKERT SEAMANS CHERIN & MELLOTT, LLC

919 East Main Street, Suite 1300
Richmond, Virginia 23219
804.778.7740
804.698.2950 (fax)
acleary@eckertseamans.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to those parties that have requested notices for this case as of February 26, 2018.

This 26th day of February, 2018.

/s/ David. M. Schilli

David M. Schilli

10644996