**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| IN RE:<br><br>BK RACING, LLC<br><br>        **Debtor.** | **CASE NO. 18-30241**<br><br>**CHAPTER 11** |

## UNION BANK & TRUST'S MOTION TO APPOINT CHAPTER 11 TRUSTEE

Union Bank & Trust ("UBT"), a senior secured creditor in the above-captioned Chapter 11 case, hereby moves the Court for the appointment of a Chapter 11 trustee (the "Motion") for Debtor BK Racing, LLC (the "Debtor"). In support of this Motion, UBT respectfully represents and states as follows:

## SUMMARY OF RELIEF REQUESTED

1.       UBT seeks the appointment of a Chapter 11 trustee to put an end to the Debtor's years of mismanagement, millions of dollars in losses, and – most recently -- failures in this Chapter 11 case to comply with the Court's orders and provide complete and accurate financial reports. The Debtor, which is controlled solely by Ronald C. Devine ("Devine"), has owned and operated a NASCAR Cup Series racing team since 2012, but has yet to operate profitably. Further, the Debtor appears to have been able to continue racing this long only by (a) failing to pay its obligations to creditors, including the Internal Revenue Service, (b) secretly selling valuable assets that serve as collateral for the Debtor's loans owed to UBT without telling UBT, and (c) receiving more than $30 million of cash infusions from Devine and others. The Debtor's operations were nothing more than an expensive ticket for Devine's admission into the NASCAR world and opportunity to talk shop in the pits at each race.

10652006

2.      Once the Debtor sought the protections of a Chapter 11 bankruptcy, its gross mismanagement, incompetence and dishonest acts continued. Just in the few weeks since the bankruptcy filing, the Debtor has violated the Court's order to deposit funds constituting cash collateral in its counsel's trust account, submitted an inaccurate and incomplete budget for its future operations, used cash collateral in excess of what was authorized by this Court and, as of the filing of this Motion, and failed to provide any financial or cash reports, accountings or other materials regarding its use of cash collateral.

3.      For all these reasons, and as discussed further below, this Court should appoint a Chapter 11 trustee for the Debtor to preserve and maximize the value of the estate and to end Devine's longstanding incompetence and mismanagement of the Debtor's business.

## JURISDICTION

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## BACKGROUND FACTS

5.      The Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on February 15, 2018 (the "Petition Date").  The Debtor continues in possession of its assets and the management of its business and affairs as a debtor in possession pursuant to Bankruptcy Code § 1107 and 1108.

6.      An Official Committee of Unsecured Creditors was appointed by this Court on March 9, 2018.

7.      As of the filing of this Motion, the Debtor has not filed its Schedules of Assets and Liabilities or its Statement of Financial Affairs, the deadline for those filings having been extended to March 15, 2018 [D.E. 55].

8.      The Debtor owns and operates a NASCAR Cup Series racing team currently racing the No. 23 car (the "Race Team"). As of the Petition Date, the Debtor's principal place of business and garage facility for the Race Team was located in Harrisburg, North Carolina.

9.      The Debtor was formed in 2012 and, for seven consecutive years has owned and been operating racing teams in the NASCAR Cup Series. Devine owns directly or indirectly through certain of his affiliates approximately 75% of the Debtor. Since 2012, Devine has been and continues to be the person solely in control of the Debtor, its finances and its operations. The day-to-day operations of the Race Team historically have been run by its general manager and hourly and contract employees. Devine has, from time to time, represented himself as the President of the Debtor and as the Vice President and Treasurer of Virginia Racers Group, LLC ("VRG"). Devine's wife, Brenda S. Devine, is the Manager of VRG.  VRG is the Manager of, and a majority member of, the Debtor.

10.     From 2012 through 2015, the Debtor operated up to four racing teams each season.

11.     In February 2016, the Debtor entered into two NASCAR Cup Series Charter Member Agreements with NASCAR Event Management, Inc. and other named NASCAR entities (each, a "CMA" and, collectively, the "CMAs"): CMA 32 and CMA 33 (each being more particularly defined in Paragraph 16 below). The Debtor acquired the CMAs on the belief that the CMAs would help it build value in its race operations. In essence, a race team holding a CMA is guaranteed entry into each weekly NASCAR Cup Series race, but that race team must,

among other things, actually compete in each weekly NASCAR Cup Series race and meet certain minimum performance standards. During the 2016 season, the Debtor operated a racing team under each CMA and also operated in various NASCAR races two racing teams in the "open" division.

12.    During the 2017 race season, following the Debtor's sale in December 2016 of CMA 33 to Front Row Motorsports, Inc. ("Front Row Motorsports"), the Debtor operated just two racing teams: one team under CMA 32 and occasionally one team in the "open" division.

13.    So far, for the 2018 NASCAR Cup Series race season, the Debtor has been operating just one racing team, that team racing under CMA 32.

<u>UBT Indebtedness</u>

14.    Before the Petition Date, UBT loaned more than $12 million to Devine and certain of his related entities, including the Debtor.  UBT's loans to Devine and certain of his entities (collectively, the "Loans") were evidenced by promissory notes, true and correct copies of which are attached as Exhibit A to the Declaration of Michael E. Walsh attached as Exhibit 1 to this Motion (the "Walsh Declaration").

15.    Before the Petition Date, in connection with Devine's receipt in May 2016 of more than $3 million in new loans from UBT for the Debtor's use, the Debtor guaranteed the obligations under the Loans pursuant to written guaranties executed by the Debtor in favor of UBT, true and correct copies of which are attached as Exhibit B to the Walsh Declaration.

16.    Before the Petition Date, in connection with Devine's receipt in May 2016 of more than $3 million in new loans from UBT for the Debtor's use, the Debtor executed written security agreements in favor of UBT pursuant to which the Debtor granted to UBT a first-

priority security interest in all of its assets, whether then existing or thereafter acquired by the

Debtor, including without limitation the following (collectively, the "Collateral"):

(a) That certain NASCAR Cup Series Charter Member Agreement 32, dated as of February 8, 2016 (relating to the assigned No. 23 car as of that date), by and among the Debtor, Devine, NASCAR Event Management, Inc. and other named NASCAR entities ("CMA 32");

(b) That certain NASCAR Cup Series Charter Member Agreement 33, dated as of February 8, 2016 (relating to the assigned No. 83 car as of that date), by and among the Debtor, Devine, NASCAR Event Management, Inc. and other named NASCAR entities ("CMA 33");

(c) All of the Debtor's titled vehicles, including tractors, trailers, trucks and other vehicles used in its motor sports business;

(d) All of the Debtor's goods, equipment, tools, machinery, furnishing and all other personal property associated with its motor sports business;

(e) All of the Debtor's general intangibles and other assets associated with its motor sport business;

(f) All of the Debtor's accounts maintained at UBT; and

(g) All products and produce of any of the foregoing;

(h) All proceeds from the sale, destruction, loss or other disposition of the property described above. [1]

True and correct copies of the security agreements described in this paragraph above are attached

as Exhibit C to the Walsh Declaration.

17. UBT caused to be filed and properly recorded in the Office of the North Carolina

Secretary of State a UCC1 financing statement and a UCC3 financing statement (collectively, the

"UBT Financing Statements") evidencing and perfecting its liens on the Collateral, true and

correct copies of which are attached as Exhibit D to the Walsh Declaration.

---

[1] The description of the Collateral set forth in this Motion is a summary description of the assets in which the Debtor has granted UBT a security interest and upon which UBT has a duly-perfected lien. The summary description is provided for the convenience of the Court and does not limit, prejudice or otherwise impair UBT's claims, rights or remedies with respect to the Collateral as more particularly set forth in the security agreements or the UBT Financing Statements attached to the Walsh Declaration.

18.     Upon information and belief, more than $5 million in proceeds of the Loans were delivered to the Debtor, including (a) more than $3 million in such proceeds when the Debtor initially executed its guaranty and security agreement in May 2016, and (b) an additional $800,000 from a pledged depository account at UBT, which was released upon the joint request of Devine and the Debtor.

19.     Five of the Loans matured on or before December 31, 2016; two of the Loans matured on September 15, 2017. UBT has not received a single payment from the Debtor or Devine on any of the Loans since January 2017 or before, despite UBT's repeated demands for payment of the Loans.

<u>The Debtor's Financial Performance, Operations and Conduct</u>

20.     The Debtor has never operated profitably. From 2013 through the first quarter of 2015, Devine was required to invest more than $15 million into the Debtor's operations to keep the race teams on the track. Based on documents received from the Debtor and Devine, true and correct copies of which are attached as <u>Exhibit E</u> to the Walsh Declaration, the Debtor consistently sustained significant losses, to wit:

| Year | Loss |
|------|------|
| 2014 | $11,017,918.00 |
| 2015 | $10,128,204.32 |
| 2016 | $8,446,837.99 |

21.     In November 2016, in the face of mounting overdrafts in the Debtor's demand deposit accounts at UBT, Devine and the Debtor jointly requested that UBT release $800,000 from a pledged depository account at UBT for, among other things, the Debtor's use in its operations.  At that time, Devine represented that he would replenish the $800,000 within 30 days.

22.     In connection with this November 2016 request for the release of cash collateral for use in the Debtor's operations, Devine represented to UBT that on behalf of the Debtor, he was negotiating a sale of CMA 33, on which UBT then had, and continues to have, a perfected first-priority lien, to a joint venture between the Debtor and another race team and that the sale would generate sufficient cash to replenish the $800,000 and pay down some of the Loans. Devine and the Debtor represented to UBT that CMA 33 was valued at $4.5 million in connection with the anticipated sale.

23.     UBT consented to release the $800,000 for the Debtor's use provided Devine and the Debtor would replenish the $800,000 within 30 days, cease overdrawing their accounts at UBT, and deliver to UBT a copy of any contract for the sale of CMA 33.

24.     Devine and the Debtor have never replenished the $800,000 in cash released by UBT. Devine and the Debtor continued to overdraw their accounts at UBT, frequently scrambling to move money from accounts at other banks to cover payroll and other checks drawn on their UBT accounts before UBT's check payment deadline.  Devine and the Debtor continued to overdraw their accounts until UBT closed the accounts in February 2017. Neither the Debtor nor Devine ever submitted to UBT a proposed contract for the sale of CMA 33 or thereafter in November or December 2016 discussed a sale or other transfer of CMA 33.

25.     Instead of entering into any joint venture, the Debtor in December 2016 sold CMA 33 to Front Row Motorsports for $2 million, receiving $1 million from Front Row Motorsports in December 2016 and $1 million from Front Row Motorsports in January 2017. The Debtor's sale price for CMA 33 was less than half of the $4.5 million value Devine and the Debtor represented to UBT just a month earlier. The Debtor sold CMA 33 to Front Row Motorsports without informing UBT, without obtaining the consent of UBT, without obtaining

from UBT the release of its lien, and without paying any of the sale proceeds to UBT in curtailment of the Loans – all in violation of the Debtor's loan documents with UBT. Indeed, UBT learned of the Debtor's sale of CMA 33 to Front Row Motorsports after the sale had been consummated and after the Debtor had otherwise dissipated the $2 million in sale proceeds.

26.    Despite repeated requests by UBT both before and after the Petition Date, the Debtor has failed to provide any 2017 year-end financial information to UBT.  Nevertheless, the Debtor "budgeted" for a loss in 2017 of $1,358,000, based on a skeletal "budget" that UBT received from the Debtor and Devine, a true and correct copy of which is attached as <u>Exhibit F</u> to the Walsh Declaration.  This optimistic upswing in the Debtor's projected financial results for 2017 is more likely attributable to the Debtor's operating half as many race teams as in previous seasons and the Debtor's abject failure to pay its creditors in 2017 than improved operations or financial controls.

27.    Since 2013, the Debtor has also consistently failed to pay Race Engines Plus, LLC ("<u>REP</u>"), which has supplied engines to the Debtor since as early as the 2013 NASCAR Cup Series season and provided other property and services to the Debtor. Based on a Judgment filed on January 3, 2017, in the Cabarrus County Superior Court, Case No. 14-CVS-3618, a true and correct copy of which is attached hereto as <u>Exhibit 2</u>, REP is owed the following amounts for the following years, as of December 12, 2016:

| <u>Year</u> | <u>Damages Awarded</u> |
|---|---|
| 2013 | $664,121.00 |
| 2014 | $628,229.00 |
| 2015 | $178,298.00 |

In addition thereto, the Debtor also owes REP an additional $647,084.25 for service fees under an engine services agreement for the 2017 NASCAR Cup Series race season.

28.    Since 2013, the Debtor has consistently failed to pay its payroll-related and other taxes to the IRS, which has already filed its proof of claim in this case. [Claim No. 2 filed February 28, 2018] Based on that proof of claim and various notices that the IRS has filed in the State Corporation Commission in Virginia and the Secretary of State's Office in North Carolina, the IRS claims to be owed the following amounts for the following years, including principal, interest and penalties:

| Year | Calendar Quarter | Balance Claimed |
|------|------------------|-----------------|
| 2013 | First, Second, Third & Fourth | $374,567.71 |
| 2014 | First, Second, Third & Fourth | $1,173,660.49 |
| 2015 | Annual | $4,856.21 |
| 2016 | Third & Fourth | $540,097.30 |
| 2017 | First, Second, Third & Fourth | $692,762.23 |

29.    In addition to not paying the IRS for payroll-related taxes, the Debtor failed to pay payroll-related taxes to the North Carolina Department of Revenue for the last two calendar quarters of 2016 and the first three calendar quarters of 2017 totaling, as of November 2017, the sum of $210,822.48, including principal, interest and penalties.  True and correct copies of the Certificates of Tax Liability filed by the North Carolina Department of Revenue in Mecklenburg County, North Carolina, on November 1, 2017 and November 8, 2017, are attached hereto as Exhibit 3. On or about January 4, 2018, the North Carolina Department of Revenue levied on and took possession of certain assets of the Debtor, including its four tractor-trailer "haulers" for the Race Team's equipment. Upon information and belief, with funds that Devine wired to the Debtor's account in North Carolina, the Debtor redeemed all of the seized property on February 8, 2018 – waiting until the last possible day for the Debtor's racing equipment to be loaded onto the redeemed haulers to arrive in time for the NASCAR-mandated, pre-race inspections for the Daytona races on February 9, 2018.

30.     Upon information and belief, the Debtor also had allowed the North Carolina Department of Motor Vehicle license tags to expire on the hauler(s) used to transport its racing equipment to the Daytona and Atlanta races.

31.     In addition, the North Carolina Department of Commerce, Division of Employment Security, filed on January 11, 2018, a Certification of Unemployment Insurance Tax Delinquency against the Debtor in Mecklenburg County, North Carolina, for non-payment of unemployment taxes for the third quarter of 2017, a true and correct copy of which is attached hereto as Exhibit 4.

UBT's Efforts to Obtain Appointment of a Receiver

32.     In January 2018, UBT learned that the Debtor, through Devine, was attempting to lease CMA 32 to another race team for the 2018 NASCAR Cup Series race season.  According to the affidavit testimony of one witness, Devine's terms were for payment of the lease price in full, up front, without notifying or involving UBT.  When the witness asked about UBT's lien on CMA 32, Devine told the witness that UBT no longer had any interest in CMA 32. A true and correct copy of the affidavit, which was filed on January 23, 2018, in UBT's Mecklenburg County Superior Court lawsuit described in the following paragraph, is attached hereto as Exhibit 5.

33.     Upon learning of the attempts of the Debtor and Devine to dispose of a CMA yet again without notifying UBT of such disposition, UBT on January 23, 2018, filed in Mecklenburg County Superior Court, Case No. 18-CVS-1067, a lawsuit to, among other things, obtain the appointment of a receiver and preliminary injunctive relief to protect its interests in the Collateral. On January 26, 2018, UBT obtained entry of a Temporary Restraining Order to

prevent, among other things, the Debtor's transfer or disposition of any assets, including CMA 32.

The Debtor's Bankruptcy Filing

34.    Just 30 minutes before UBT was to be heard by the Mecklenburg County Superior Court on its request for the appointment of a receiver and a preliminary injunction, the Debtor filed this Chapter 11 case.

35.    Almost immediately following the Debtor's filing of this Chapter 11 case, Devine gave an interview to NBC Sports in which he was reported to have said that he "filed (Chapter 11 bankruptcy) because the bank wouldn't stop trying to get a receiver (to oversee the team's collateral).''  When asked how the Debtor found itself in such a poor financial position, Devine reportedly said, "I think it's a tough business. I think it's an expensive learning curve. You've got to decide where you are taking the company. I took it down a very independent route. Probably wasn't the smartest. I think the right thing to do is get an alignment." A true and correct copy of the article on the NBC Sports website is attached hereto as Exhibit 6.

36.    Additionally, Devine gave an interview to ESPN in which he was reported to have said "The main thing right now is [with this filing] to keep the bank from trying to get a receiver so they can steal our charter and push it over to somebody else." A true and correct copy of the article on the ESPN website is attached hereto as Exhibit 7.

37.    Before the start of the 2018 NASCAR Cup Series race season, the Debtor canceled its insurance policies covering its business, including motor vehicle insurance, general liability insurance, business personal property insurance, workers compensation insurance, and inland marine insurance.  The Debtor operated at and participated in the Daytona races over the weekend of February 16 – 19 without any of the aforementioned insurance in place. The Debtor

did not restore insurance coverage until February 28, 2018, after this Court notified the Debtor in open court on February 27, 2018, that it would enter an order suspending the Debtor's operations if full insurance coverage was not obtained by 5:00 p.m. on February 28, 2018.

38.    On February 23, 2018, in connection with its request for authority from the Court to use cash collateral, the Debtor submitted to the Court and creditors a document entitled, "BK Racing, LLC Profit and Loss – 2018 Budget Analysis with One Charter," a true and correct copy of which is attached hereto as Exhibit 8, and another untitled document purporting to identify anticipated race expenses on a race-by-race basis, a true and correct copy of which is attached hereto as Exhibit 9 (collectively, the "Budget Documents").

39.    Since the Debtor originally tendered its Budget Documents, the creditors have learned that the documents fail to accurately reflect the income and expenses anticipated by the Debtor for the 2018 race season in a number of material respects, including the following:

(a)    Although nearly half of the Debtor's budgeted income for 2018 is attributable to sponsorships, the Budget Documents failed to disclose that the Debtor has not received any cash from purported sponsors.

(b)    The Budget Documents made no provision for the payment of insurance premiums.

(c)    The Budget Documents did not include quarterly membership payments due to NASCAR under the terms of CMA 32. NASCAR recently advised that the Debtor has failed to pay post-petition membership fees exceeding $41,000, which is a default under the terms of CMA 32.

(d)    The Budget Documents did not include a budgeted category for reserves to cover the expense of repairing the Debtor's race car in the event of a wreck.

(e)    The Budget Documents did not include, and cannot support, adequate protection payments to UBT, the IRS or other secured creditors.

40.    On February 27, 2018, in response to creditors' questions concerning the Budget Documents, Devine disclosed that the Debtor's primary sponsor, Earthwater, Ltd.

("Earthwater"), paid **no** cash for its **annual** sponsorship of the Race Team, but instead gave the Debtor 350,000 shares of its closely-held stock, which shares are not traded on a recognized market. Devine advised creditors that the Earthwater shares are traded privately at $0.50 per share. The Debtor has not been able to explain how it plans to achieve the $3,625,000 in sponsorship revenue and other income projected on Exhibit 8 in light of Devine's decision to sell its primary sponsorship for **no** cash.

41.    The Debtor also disclosed at the February 27, 2018 hearing that Devine and others have made loans to the Debtor after the Petition Date without this Court's authority for race engines and other expenses necessary for the Debtor's operation, yet none of the financial information provided by the Debtor to date reflects these unauthorized loans to the Debtor.

42.    At the February 23 and 27 hearings on the *Emergency Motions of the Debtor for Order Authorizing i) the Use of Cash Collateral Pursuant to Sections 361 and 363 of the Bankruptcy Code; ii) the Payment of Pre-Petition Payroll and Payroll Taxes* [D.E. 28], this Court ordered the Debtor to transfer all but $100,000 of the proceeds the Debtor received from NASCAR for the Daytona race to the trust account of Debtor's attorney.  As of the close of business on March 8, 2018, the Debtor had not transferred any funds to the trust account of its attorney, despite this Court's express Order and deadline.

43.    On March 6, 2018, the Debtor's counsel informed the Court that the DIP account contained considerably less than the roughly $358,000 that should have been available to be transferred to his trust account, suggesting that the Debtor had exceeded the authority granted by the Court at the February 23 and 27 hearings for the use of cash collateral. As of the filing of this Motion, the Debtor has not disclosed at any time following the Petition Date its cash position and has never delivered any sort of cash flow statement to UBT or the other secured creditors.

44.    The Debtor also disclosed through its counsel's March 6, 2018 communications with the Court, that the Budget Documents prepared by the Debtor and upon which the Debtor, this Court and the creditors relied at the February 23 and 27 hearings, do not accurately reflect how the Debtor pays its racing expenses.  As a result of its failure to provide an accurate and complete budget, it has used cash collateral in excess of what was authorized by this Court.

45.    The Debtor's apparent lack of established financial reporting processes and the lack of detail and accuracy in the financial reports provided by the Debtor to date demonstrate that the financial information is unreliable and that the Debtor is not well managed. The Debtor, accordingly, will be hampered in its ability to confirm a reorganization plan if current management is permitted to remain in control.

## RELIEF REQUESTED

46.    By this Motion, UBT seeks an order appointing a Chapter 11 trustee for the Debtor and requests that the Court consider Matthew W. Smith ("Smith"), Managing Director of The Finley Group, Inc. ("Finley Group"), as the Chapter 11 trustee in this case because of the exigencies presented by this case, his unique qualifications based on race industry experience and Finley Group's knowledge of the issues presented by this case due to its work in preparing to be the court-appointed receiver in UBT's state court litigation filed in January 2018.

## BASIS FOR RELIEF REQUESTED

47.    Under Bankruptcy Code § 1104(a), the Court must order the appointment of a Chapter 11 trustee in two circumstances:

(1): for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2):   if such appointment is in the interests of creditors, any equity security holders, and other interest of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

The "[a]ppointment of a trustee is a power which is critical for the [C]ourt to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re Breland*, 570 B.R. 643, 657 (Bankr. S.D. Ala. 2017) (citation omitted). The decision to appoint a Chapter 11 trustee is "fact intensive and the determination must be made on a case-by-case basis." *Id.*

## A.     Cause Exists to Appoint a Chapter 11 Trustee.

48.     Section 1104(a)(1) of the Bankruptcy Code lists several circumstances which constitute "cause" for appointing a Chapter 11 trustee: "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." This list is not exhaustive, however, and a court may appoint a trustee for "similar cause." 11 U.S.C. § 1104(a)(1). Thus, courts have identified a variety of other factors relevant to deciding whether cause exists to appoint a trustee, including: "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence." *In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015); *see also* 7 Collier on Bankruptcy ¶ 1104.02[3][c][i] (16th ed. 2016) (listing same factors). The plain language of Bankruptcy Code § 1104(a) also makes clear that the Court can review the debtor's pre- and post-bankruptcy conduct to determine if cause exists to appoint a trustee. *See also In re Okla. Ref. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("[P]repetition activity may be considered as part of a § 1104 determination.").

49.    Courts have held that another independent basis for appointing a trustee under section 1104(a)(1) for cause is a debtor's failure to provide accurate records and reports. *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009) (collecting cases). This is because "[o]ne of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization." *Id.* (citation and quotation marks omitted). Thus, if a debtor fails to provide "material and relevant information to the Court and creditors, a Chapter 11 trustee is required." *Id.* (citation and quotation marks omitted); *see also Okla. Refining*, 838 F.2d at 1136 ("It is also established that failure to keep adequate records and make prompt and complete reports justifies the appointment of a trustee.").

50.    Here, based on the evidence of the Debtor's business operations before and after the Petition Date, as described above, cause exists to appoint a Chapter 11 trustee due to the Debtor's dishonesty, incompetence, gross mismanagement, and failure to keep and provide accurate records and financial reports.

51.    The Debtor's dishonesty is demonstrated by, among other things, its:

(a)    Misrepresentation to UBT that it would replenish $800,000 in cash collateral released by UBT within 30 days;

(b)    The representation by the Debtor that CMA 33 was valued at $4.5 million in a transaction contemplated by the Debtor in November 2016, yet the Debtor's sale of CMA 33 in December 2016 for $2 million;

(c)    The Debtor's sale of CMA 33 without informing UBT, without obtaining the consent of UBT, without obtaining from UBT the release of its lien, without holding the sale proceeds in trust for UBT's benefit and without paying any of the sale proceeds to UBT in curtailment of the Loans, all in clear violation of the Debtor's loan documents with UBT; and

(d)    The Debtor's efforts in January 2018 to sell CMA 32 without informing UBT and also telling a potential purchaser that UBT no longer had any interest in CMA 32.

52.    The Debtor's incompetence and gross mismanagement are evidenced, among other things, by its:

(a)    Failure to ever operate profitably, and its consistent and significant losses in 2014, 2015, 2016 and – almost assuredly – 2017;

(b)    Consistent and repeated failure, since 2013, to pay its payroll-related taxes to the IRS;

(c)    Failure to pay payroll-related taxes to the N.C. Department of Revenue for significant portions of 2016 and 2017;

(d)    Consistent and repeated failure to pay REP, which has supplied engines to the Debtor since as early as the 2013 NASCAR Cup Series race season;

(e)    Canceling its business insurance coverage before the 2018 NASCAR Cup Series race season, leading the Debtor to operate and race at Daytona over the weekend of February 16 – 19, 2018 without replacement insurance in place;

(f)    Post-petition agreement with Earthwater allowing Earthwater to be the Debtor's primary sponsor for the 2018 NASCAR Cup Series race season for no cash consideration;

(g)    Inability to obtain other sponsorships for the 2018 NASCAR Cup Series race season;

(h)    Failure to comply with the Court's order requiring the Debtor to transfer $358,000 in proceeds from the Daytona races to its counsel's trust account; and

(i)    Use of cash collateral beyond the authority granted by the Court or beyond the consent of UBT and other secured creditors.

53.    The Debtor's failure to keep and provide accurate records and reports is shown, among other things, by its:

(a)    Failure to prepare budgets for the 2018 race season that accurately reflect the income and expenses anticipated by the Debtor and how the Debtor pays its racing expenses;

(b)    Failure to produce financial information for 2017;

(c)    Failure to provide financial reports requested by the UBT, agreed to by the Debtor and ordered by this Court; and

      (d)     Significant deviations in its financial performance relative to the Budget Documents.

54.     In sum, UBT respectfully submits that ample evidence exists of cause to appoint a Chapter 11 trustee under § 1104(a)(1).

**B.     Appointment of a Chapter 11 Trustee Is in the Interests of the Debtor's Estate and Creditors.**

55.     The standard under Bankruptcy Code § 1104(a)(2) provides an independent basis for the Court to appoint a Chapter 11 trustee for the Debtor. The standard there focuses on whether such an appointment would be in the interests of the estate generally, including "the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). Courts recognize that § 1104(a)(2) "creates a flexible standard which allows for appointment of a trustee, even though 'cause' may not exist, when so doing would serve the interests of creditors and the estate. Factors which justify appointment of a trustee under this subsection are highly diverse and in essence reflect the practical reality that a trustee is needed to manage the debtor's affairs." *In re Nartron Corp.*, 330 B.R. 573, 592 (Bankr. W.D. Mich. 2005).

56.     In applying the test under Bankruptcy Code § 1104(a)(2), courts commonly consider four factors in determining whether appointment of a trustee is in the interest of the estate and creditors: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; [and] (iv) the benefits derived by the appointment of a trustee, balanced against the costs of appointment." *Tradex Corp. v. Morse*, 339 B.R. 823, 829 (D. Mass. 2006) (citation omitted).

57.     In this case, each of the four *Tradex* factors strongly favors the appointment of a trustee as being in the best interests of the estate and creditors:

(a)    <u>Lack of Trustworthiness</u>: As detailed above, the Debtor's numerous pre-petition acts of dishonesty in dealing with UBT regarding CMA 32, CMA 33, and the replenishment of $800,000 in cash collateral and the Debtor's violation of this Court's orders demonstrate the Debtor's lack of trustworthiness.

(b)    <u>Poor Past and Present Performance and Prospects for Rehabilitation</u>: The Debtor's history of operating at significant losses for years, as described above, supports the appointment of a Chapter 11 trustee. In fact, the Debtor has never operated its business at a profit. Further, UBT submits that due to the Debtor's post-petition performance in the 2018 race season, its failure to secure any sponsorships from which it will receive any meaningful funds, its significant weekly expenses and expected weak cash position, there are no reasonable prospects for the Debtor's successful rehabilitation. UBT, therefore, believes the best interests of creditors would be served by the appointment of a Chapter 11 trustee, who could decide the best way to preserve the value of the Debtor's assets, particularly CMA 32.

(c)    <u>Lack of Confidence in Current Management</u>: In light of the Debtor's years of poor performance under its current management (Devine), coupled with the Debtor's and Devine's dishonesty, demonstrated incompetence, violations of this Court's orders and its inability and/or failure to provide accurate financial reporting to UBT and other creditors, UBT has no confidence in the abilities of the Debtor's management to operate the business. UBT believes that, for similar reasons, other material creditors of the Debtor have a similar view of Devine's ability to manage the Debtor during the bankruptcy process and lead the Debtor through a successful restructuring.

(d)    <u>Balancing Costs and Benefits</u>: For the reasons discussed below, if Smith is appointed as Chapter 11 trustee, UBT submits that the costs and disruptions normally associated with appointing a Chapter 11 trustee will be minimized, and the benefits of appointing a proven, experienced professional as trustee will be many, including having timely and accurate reporting of the Debtor's operations and financial condition. Moreover, the Chapter 11 trustee will, unlike Devine, satisfy the duty owed to the Debtor's creditors and its estate to preserve and maximize the value of all of the estate's assets, including CMA 32 – its most valuable asset.

58.    Accordingly, each of these four factors heavily favors the appointment of a Chapter 11 trustee. Taken together, along with the other evidence of the Debtor's dishonest acts and longstanding mismanagement of its business, UBT submits an independent basis exists

under Bankruptcy Code § 1104(a)(2) for the appointment of the trustee as being in the best interests of the Debtor's estate and creditors

59.    Indeed, here, Devine is the problem, not the solution. Devine, the Debtor's principal, is causing the Debtor to violate orders of this Court and/or he is not fulfilling his duties to the Debtor's creditors and its estate. Rather, Devine is acting in his own self-interest because he wants to personally continue to be involved in the sport of NASCAR, and his judgment is clouded by that own self-interest to the detriment of the Debtor, its creditors and estate.

60.    Operating under CMA 32, the Debtor has finished in the bottom three positions of CMA owners at the end of the 2016 and 2017 NASCAR Cup Series race seasons. If the Debtor finishes in the bottom three again this race season, NASCAR will have the right to declare a default by the Debtor under CMA 32 and to terminate CMA 32. Although the Debtor finished in 20th place at the Daytona 500 on February 19, the Debtor did not complete the Atlanta race on February 26 and finished in 36th place (out of 36 entries). The Debtor did not complete the Las Vegas race on March 4 and finished in 33rd place (out of 37 entries). With each poor performance by the Debtor, the value of CMA 32 will continue to decrease, with a real possibility that CMA 32 -- which at this point, at least, still has value – will soon be worthless. If the Debtor were fulfilling its duties to creditors, the Debtor should be thinking about monetizing CMA 32 while it still has value. But, Devine refuses to consider that path because it would mean he no longer would have the Race Team.

**C.    Smith Should Be Considered as Chapter 11 Trustee.**

61.    UBT submits that Smith of Finley Group, who is known to this Court, would be an ideal candidate to serve as the Chapter 11 trustee for the Debtor. Smith has a Masters in Business Administration from UNC-Chapel Hill and has both the Certified Turnaround Professional (CTP) and Certified Insolvency and Restructuring Advisor (CIRA) designations.

Smith has years of experience working with businesses involved in corporate restructurings and liquidations, in situations similar to the Debtor. Attached hereto as Exhibit 10 are materials that further describe Smith's qualifications for his potential role as Chapter 11 trustee, as well as the qualifications of Blake Hauk of Finley Group ("Hauk"), who is expected to assist Smith in his role as trustee due to the exigencies of this engagement.

62.     Aside from these qualifications, Smith is particularly suited to serve as Chapter 11 trustee in this case. Smith is familiar with the motorsports industry, having previously worked with businesses involved in the NASCAR industry and served as member of the Board of Directors of the North Carolina Motorsports Association. Smith is already up to speed on the Debtor's business and financial circumstances. Before the Petition Date, UBT had anticipated having Finley Group appointed as the receiver in the state-court receivership action filed against the Debtor. Thus, shortly before the Petition Date, UBT worked closely with Finley Group to educate Finley Group, including Smith and Hauk, on the Debtor's business and financial condition. UBT wanted Finley Group to have the knowledge and background so that it could immediately step in as receiver and continue operating the Debtor's business with minimal disruptions.

63.     Since the Petition Date, UBT has kept in contact with Smith, and he is ready and willing to serve as Chapter 11 trustee. With Smith's expertise, experience in the sport of NASCAR, and knowledge of the Debtor's business and financial condition, UBT expects that any disruptions and costs associated with appointing a Chapter 11 trustee will be minimized.

WHEREFORE, UBT respectfully moves the Court for the appointment of a Chapter 11 trustee, for this Court's consideration of Matthew W. Smith of The Finley Group, Inc. as Chapter 11 trustee, and such other and further relief as is just and proper.

This 9th day of March, 2018.

/s/ David M. Schilli

David M. Schilli
N.C. State Bar No. 17989
dschilli@robinsonbradshaw.com
Stuart L. Pratt
N.C. State Bar No. 43139
spratt@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.

101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
704.377.2536
704.378.4000 (fax)

/s/ Annemarie DiNardo Cleary

Annemarie DiNardo Cleary
 (Va. State Bar No. 28704)
(admitted *pro hac vice*)

ECKERT SEAMANS CHERIN & MELLOTT, LLC

919 East Main Street, Suite 1300
Richmond, Virginia 23219
804.778.7740
804.698.2950 (fax)
acleary@eckertseamans.com

*Attorneys for Union Bank & Trust*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that the foregoing has been served upon those parties that have requested notices for this case as of March 9, 2018 through the CM/ECF system and upon the following parties by depositing same in the United States mail, postage prepaid, in envelopes addressed as follows and/or by means of the Electronic Filing System of the Bankruptcy Court:

| | |
|---|---|
| Airtight Facilitech<br>1338 Hundred Oaks Drive Ste C<br>Charlotte, NC 28217 | Bluewater Partners LLC<br>c/o David P Parker PLLC<br>242 East Broad Street<br>Statesville, NC 28677 |
| Bluewater Partners LLC<br>150 Kevin Drive<br>Troutman, NC 28166 | Robert Jeffrey dba JeffCo<br>334 E. Kearney St.<br>PBM 292<br>Springfield, MO 65803 |
| Bordeaux Dyno Cams<br>22247 Andrew Jackson Hwy<br>Delco, NC 28436 | Cabarrus County Tax Collector<br>Courthouse Box 707<br>Concord, NC 28025 |
| Champion Air LLC<br>c/o Dale Earnhardt Inc<br>1675 Dale Earnhardt Blvd<br>Highway 3<br>Mooresville, NC 28115 | Champion Tire & Wheel<br>11106 Treynorth Drive<br>Cornelius, NC 28031 |
| City of Charlotte<br>PO Box 1316<br>Charlotte, NC 28201-1316 | Cometic Gasket<br>8090 Auburn Road<br>Concord, OH 44077 |
| Components USA<br>PO Box 13254<br>Newark, NJ 07101-3254 | ConSeaAir LLC<br>3157 Heirloom Rose Place<br>Oviedo, FL 32766 |
| Douglas S Fritz<br>9610 Rayneridge Drive<br>Huntersville, NC 28078 | Duke Energy<br>PO Box 470515<br>Charlotte, NC 28272-0505 |
| Employment Security Commission of NC<br>PO Box 26504<br>Raleigh, NC 27611 | Enterprise Holdings Inc<br>PO Box 840173<br>Kansas City, MO 64184-0173 |
| Enviro-Master<br>PO Box 12350<br>Charlotte, NC 28220 | Foxboro Financial Services LLC<br>c/o Michael C Diseveria<br>16200 Bellingham Drive<br>Germantown, MD 20874-3240 |
| Front Row Motorsports<br>2670 Peachtree Rd<br>Statesville, NC 28625 | Gray Gaulding<br>154 Heathrow Lane<br>Statesville, NC 28677 |
| Gray Gaulding Racing Inc<br>154 Heathrow Lance<br>Statesville, NC 28677 | Harraka Racing Equipment<br>143 Village View Drive Ste 312<br>Mooresville, NC 28117 |
| Internal Revenue Service<br>Centralized Insolvency Operations<br>PO Box 7346<br>Philadelphia, PA 19101-7346 | Internal Revenue Service<br>8405 Greensboro Dr Ste 700<br>Mc Lean, VA 22102 |
| Internal Revenue Service<br>Cincinnati, OH 45999-0039 | Iowa City Capital Partners LC<br>2310 Lake Ridge Place NE<br>North Liberty, IA 52317 |
| James McElroy & Diehl P A<br>c/o Adam L Ross<br>525 N Tryon Street Ste 700<br>Charlotte, NC 28202 | L A M Z Enterprises LLC<br>c/o Wayne M D Press<br>8665 Bay Colony Drive #703<br>Naples, FL 34108 |
| MCI Racing LC<br>c/o Anthony Marlow<br>2937 Sierra Ct SW<br>Iowa City, IA 52240 | MCI Racing LP<br>c/o Anthony Marlow<br>7780 Office Plaza Drive S #100<br>West Des Moines, IA 50266 |
| Mike Wheeler<br>40231 Browns Creek Place<br>Leesburg, VA 20175 | Moroso Performance<br>80 Carter Drive<br>Guilford, CT 06438 |

| | |
|---|---|
| NASCAR Broadcasting LLC<br>Attn: General Counsel<br>One Daytona Boulevard<br>Daytona Beach, FL 32114 | NASCAR Digital Media LLC<br>Attn: General Counsel<br>One Daytona Boulevard<br>Daytona Beach, FL 32114 |
| NASCAR Event Management Inc<br>Attn: General Counsel<br>One Daytona Boulevard<br>Daytona Beach, FL 32114 | NASCAR Media Group LLC<br>Attn: General Counsel<br>One Daytona Boulevard<br>Daytona Beach, FL 32114 |
| NASCAR Media Ventures LLC<br>Attn: General Counsel<br>One Daytona Boulevard<br>Daytona Beach, FL 32114 | NASCAR Productions LLC<br>Attn: General Counsel<br>One Daytona Boulevard<br>Daytona Beach, FL 32114 |
| NC Department of Revenue<br>Bankruptcy Unit<br>PO Box 1168<br>Raleigh, NC 27602 | NC Department of Revenue<br>PO Box 25000<br>Raleigh, NC 27640-0002 |
| Nelson Mullins<br>PO Box 11070<br>Columbia, SC 29211 | Panki Racing Systems UK Ltd<br>Industriestra Be West 4<br>Kapfenberg<br>A-8605 |
| Precision Products<br>PO Box 1229<br>Arden, NC 28704 | Robert A Muckenfuss<br>McGuireWoods<br>201 N Tryon Street Ste 3000<br>Charlotte, NC 28202 |
| RJ Waste & Recovery Inc<br>9925 Metromont Ind. Blvd<br>Charlotte, NC 28269 | Ron Ingalls<br>Ingalls Refinery LLC<br>210 Senior Circle<br>Lompoc, CA 93446 |
| Ron Devine<br>6320 Augusta Drive Ste 1400<br>Springfield, VA 22150 | Simpson Performance Products<br>328 FM306<br>New Braunfels, TX 78130 |
| Signals Seals & Fasteners<br>PO Box 1135<br>Mooresville, NC 28115 | Sterling Foundation Management<br>LLC<br>12030 Sunrise Valley Drive Ste<br>450<br>Reston, VA 20191 |
| Sport Venture Group LLC<br>PO Box 2330<br>Mount Pleasant, SC 29465 | Triad Racing Technologies<br>235 Raceway Drive<br>Mooresville, NC 28117 |
| The Lynch Racing Co<br>Division of Sport Venture Group LLC<br>PO Box 2330<br>Mount Pleasant, SC 29465 | Troy J Stafford<br>DeVore Acton & Stafford<br>438 Queens Road<br>Charlotte, NC 28207 |
| TriStar Motorsports<br>330 Aviation Drive<br>Statesville, NC 28677 | United States Attorney<br>227 West Trade Street Suite 1700<br>Charlotte, NC 28202 |
| Virginia Racers Group LLC<br>c/o Brenda S Devine<br>6320 Augusta Road Flr 15<br>Springfield, VA 22150 | Watson Electric Co Inc<br>PO Box 467<br>Huntersville, NC 28070 |
| Winberg Crankshafts<br>333 W 48th Avenue<br>Denver, CO 80216 | Winberg Precision<br>2190 S Jason Street<br>Denver, CO 80223 |
| Windstream<br>PO Box 9001908<br>Louisville, KY 40290-1908 | Windstream<br>PO Box 9001950<br>Louisville, KY 40290-1950 |
| Yeley Racing Corp<br>8124 Parkton Gate Drive<br>Huntersville, NC 28078 | Champion Air LLC<br>Attn:  Don Wright<br>1675 Dale Earnhardt Hwy 3<br>Mooresville, NC 28115 |
| ConSeaAir LLC<br>Attn:  Donald Ulrich<br>2890 Grumman Ct<br>Port Orange, FL 32128 | Patrick Donahue<br>16204 Winnow Ct.<br>Cornelius, NC 28031 |
| Race Engines Plus LLC<br>Attn:  Robin Trivette<br>7100 Weddington Rd NW<br>Concord, NC 28027 | |

This 9th day of March, 2018.

/s/ David M. Schilli
_____
David M. Schilli

10652006