## ASSET PURCHASE AGREEMENT GENERAL PROVISIONS

Seller:                              Matthew W. Smith, chapter 11 trustee for BK Racing, LLC

Seller's Address:                    212 S. Tryon St., Ste. 1050, Charlotte, NC 28202

Seller's Email Address:              matt@finleygroup.com

Execution Date:                      July 20, 2018

Buyer:                               MBR LLC

Fixed Assets Purchase Price:         

Champion Assets Purchase Price:      

Titled Vehicles Purchase Price:      

Priority Wage Claim Amount:          $350,000.00

Total Purchase Price:                $1,800,000.00

## EXHIBIT A

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into by and among: **MATTHEW W. SMITH** ("Seller"), in his capacity as the duly-appointed trustee for BK Racing, LLC (the "Debtor"); the person or entity indicated as the "Buyer" in the *Asset Purchase Agreement General Provisions* (the "General Provisions") appearing above and/or such person's or entity's successor(s) or assign(s) ("Buyer"); and the person signing this agreement as the "Buyer's Control Person" ("Buyer's Control Person"). Each of Seller, Buyer, and Buyer's Control Person may be sometimes referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS**, the Debtor is in the business of operating a NASCAR Chartered, Monster Energy cup series ("Cup Series") race team;

**WHEREAS**, on February 15, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), initiating case number 18-30241 before the Bankruptcy Court (the "Bankruptcy Case");

**WHEREAS**, the Bankruptcy Court appointed Seller as the Debtor's chapter 11 trustee pursuant to a written Order entered in the Bankruptcy Case on March 30, 2018;

**WHEREAS**, as of the Petition Date, the Debtor was a party to that certain *NASCAR Cup Series Charter Member Agreement* entered into by and between NASCAR Event Management, Inc. ("NEM") and related entities (collectively, "NASCAR"), Ronald C. Devine ("Devine"), and the Debtor, assigned NASCAR Charter member agreement number 32 (the "NASCAR Charter");

**WHEREAS**, Union Bank & Trust, the Internal Revenue Service, and other parties assert that, as of the Petition Date, a lien in favor of each of them encumbered the NASCAR Charter;

**WHEREAS**, pursuant to Bankruptcy Code §§ 363, 1106, and 1108, among others, Seller has the right and authority to operate the Debtor's business, oversee the Debtor's financial affairs, and use, sell, lease, or otherwise dispose of the Debtor's assets, including the NASCAR Charter;

**WHEREAS**, Buyer desires to buy, and Seller desires to sell, the NASCAR Charter and certain related assets on the terms and conditions set forth herein;

**WHEREAS**, § 8.1(b) of the NASCAR Charter requires (1) Seller to provide advance written notice to NEM of any contemplated transfer of the NASCAR Charter and (2) Buyer to certify to NEM that Buyer is not a "Prohibited Person" within the meaning of the NASCAR Charter;

## EXHIBIT A

**WHEREAS**, Seller represents and warrants to Buyer that Seller has provided advance written notice to NEM of the NASCAR Charter transfer contemplated in this Agreement;

**WHEREAS**, Buyer represents and warrants to Seller that Buyer is not a "Prohibited Person" within the meaning of the NASCAR Charter and that Buyer has certified the accuracy of this statement to NASCAR's satisfaction; and

**WHEREAS**, NASCAR has tentatively approved Buyer as the "Team Owner," and Buyer's CP as the "Control Person," under the NASCAR Charter.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.**     ***Definitions and Interpretation:*** Unless the context otherwise clearly indicates, in this Agreement:  (a) the singular includes the plural; (b) "includes" and "including" are not limiting; (c) "may not" is prohibitive and not permissive; and (d) "or" is not exclusive.  Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings prescribed in the NASCAR Charter.  Notwithstanding, the following terms used in this Agreement shall have the following meanings.

***1.1.***     "Acquired Assets" means all assets of Seller other than the Excluded Assets. Without limiting the generality of the foregoing, the Acquired Assets shall include: (a) all of the Debtor's right, title, and interest in and to the NASCAR Charter subject to the terms, conditions, and limitations set forth in the NASCAR Charter and the relevant provisions of the NASCAR Rule Book; (b) all Fixed Assets and Titled Vehicles; (c) all other furniture, fixtures, machinery, equipment, and inventory; and (d) all trade names, trademarks, and other intellectual property.

***1.2.***     "Acquisition Proposal" means a definitive proposal (other than by Buyer or its affiliates) relating to any merger, consolidation, business combination, sale or other disposition of all or any portion of the Acquired Assets pursuant to a transaction, the sale of all or substantially all of the outstanding shares of capital stock or equity interests of Debtor (including by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination.

***1.3.***     "Assumed Liabilities" means (a) all duties and obligations owed by the Debtor in favor of NEM and NASCAR as set forth in the NASCAR Charter, and (b) all obligations under any Sponsorship Agreement in the event that the Sponsorship Agreement is assigned to Buyer.

***1.4.***     "Back-Up Bidder" shall have the meaning ascribed to it in the Bidding Procedures Order.

***1.5.***     "Bankruptcy Case" shall have the meaning given to such term in the Recitals to this Agreement.

## EXHIBIT A

*1.6.* "Bankruptcy Code" shall have the meaning given to such term in the Recitals to this Agreement.

*1.7.* "Bankruptcy Court" means the United States Bankruptcy Court for the Western District of North Carolina.

*1.8.* "Bidding Procedures Order" means the order of the Bankruptcy Court, in the form attached hereto as Exhibit A (or in such other format as acceptable to Buyer in its sole discretion) which approves, among other things, the Breakup Fee payable to Buyer under this Agreement.

*1.9.* "Breakup Fee" means One Hundred Thousand Dollars and Zero Cents ($100,000.00).

*1.10.* "Business" shall mean the Debtor's business of operating a Cup Series race team.

*1.11.* "Champion Assets" means all of the Debtor's right, title, and interest in and to those certain items of equipment and other assets subject to liens in favor of Champion Tire & Wheel, Inc., including two pit boxes, one tire buggy, one cook cart, the Debtor's tire inventory, and the Debtor's wheel inventory.

*1.12.* "Closing" means (the occurrence of all acts necessary to consummate the transaction contemplated by this Agreement.

*1.13.* "Closing Date" means the date upon which the Closing occurs; *provided, however*, that the Closing Date shall occur no later than three (3) business days following the Sale Order becoming a Final Order, with the understanding that the Parties shall make all reasonable efforts, but not be required, to complete the Closing on or before the tenth (10th) day following entry of the Sale Order, except as otherwise provided in this Agreement.

*1.14.* "Competitive Sale" shall have the meaning ascribed to it in the Bidding Procedures Order.

*1.15.* "Encumbrance" shall mean any mortgage, pledge, lien, security interest, charge, or claim against, or other interest of any type, and the term interest shall be given the broadest possible meaning for purposes of Section 363(f) of the Bankruptcy Code.

*1.16.* "Escrow Agent" shall mean the law firm of Grier, Furr & Crisp, P.A., or such other escrow agent that may be mutually agreed upon by Buyer and Seller.

*1.17.* "Excluded Assets" means:  (a) any cash, bank deposits, or other cash equivalents of Seller; (b) any accounts receivable or other rights to payment; (c) any litigation claims; and (d) any right or obligation under any lease or executory contract that is not assumed and assigned to Buyer..

*1.18.* "Execution Date" means the date of Buyer's execution of this Agreement as set forth in the General Provisions.

# EXHIBIT A

**1.19.** "Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

**1.20.** "Fixed Assets" means all of the Debtor's right, title, and interest in and to those certain items of equipment and other fixed assets identified on <u>Exhibit B</u>, attached hereto and incorporated herein by reference.

**1.21.** "Good Faith Deposit" means a dollar amount equal to ten percent (10%) of the Purchase Price.

**1.22.** "Material Adverse Change" means, any event, change, condition or matter that, individually or in the aggregate is or would reasonably be expected to materially impair the value of the Acquired Assets or results in a material adverse effect or change in the operation, condition (financial or otherwise) of the Acquired Assets or the Business, taken as a whole, and including, without limitation the occurrence of any event that would constitute an event of default under the NASCAR Charter.

**1.23.** "NASCAR" shall have the meaning given to such term in the Recitals to this Agreement.

**1.24.** "NASCAR Charter" shall have the meaning given to such term in the Recitals to this Agreement.

**1.25.** "NASCAR Rule Book" means the Cup Series Rule Book, as it may be amended, supplemented, or otherwise modified from time to time by NASCAR.

**1.26.** "NDA" means the *Confidentiality and Non-Disclosure Agreement* executed by Buyer and Seller in connection with the transactions contemplated herein but prior to execution of this Agreement.

**1.27.** "NEM" shall have the meaning given to such term in the Recitals to this Agreement.

**1.28.** "NEM Documents" means any and all documents as NEM may require in connection with consenting to, and otherwise effectuating, the transfer of the NASCAR Charter, including, without limitation, any "Transfer Approval Form" or "Joinder Agreement."

**1.29.** "Outside Date" means September 15, 2018.

**1.30.** "Priority Wage Claims" means all claims in the Bankruptcy Case made by or on behalf of the Debtor's current employees for past-due wages and reimbursable medical expenses entitled to priority pursuant to § 507(a)(4) of the Bankruptcy Code.

**1.31.** "Purchase Price" means One Million Eight Hundred Thousand Dollars and Zero Cents ($1,800,000.00). Seller and Buyer agree that the Purchase Price shall be allocated as set forth in the General Provisions between the NASCAR Charter, Fixed Assets, Titled

# EXHIBIT A

Vehicles, and Priority Wage Claims; *provided, however*, that the amount allocated to Priority Wage Claims shall be lesser of $350,000.00 and the aggregate amount of all Priority Wage Claims that are ultimately allowed in the Bankruptcy Case, with any difference between $350,000.00 and the aggregate amount of allowed Priority Wage Claims being attributed to the NASCAR Charter.

**1.32.** "Sale Approval Date" means the date that the Bankruptcy Court enters the Sale Order; *provided, however*, that in the event a stay of the Sale Order pending appeal has been entered prior to the Closing Date, then the Sale Approval Date shall be deemed to have not occurred.

**1.33.** "Sale Order" means an order entered by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code, in form and substance acceptable to Buyer in its reasonable discretion which order shall, amongst other approvals, approve the sale of the Acquired Assets to Buyer (including, without limitation, the conveyance of the NASCAR Charter by Seller to Buyer) free and clear of all Encumbrances pursuant to Section 363(f) of the Bankruptcy Code and which order shall include the determination that Buyer is a good faith purchaser for purposes of Section 363(m) of the Bankruptcy Code.

**1.34.** "Sponsorship Agreement" means any sponsorship agreement:  (a) developed and otherwise secured by Seller for the benefit of the Debtor's race team for the remainder of the 2018 Cup Series season that becomes effective prior to the Closing Date; and (b) is consented to by Buyer, which consent shall not be unreasonably withheld.

**1.35.** "Titled Vehicles" means all of the Debtor's right, title, and interest in and to those certain titled motor vehicles identified on <u>Exhibit C</u>, attached hereto and incorporated herein by reference.

**1.36.** "Transaction Documents" means this Agreement and any document required to be executed to consummate the transaction contemplated by this Agreement.

**2.**   ***Effectiveness of Agreement:*** The terms and provisions of this Agreement shall be subject to the condition precedent of approval by the Bankruptcy Court.  In addition, in the event Buyer becomes a "Prohibited Person" within the meaning of the NASCAR Charter or otherwise fails to be able to qualify as a "Team Owner" (in NEM's sole discretion) during the interim period between the Execution Date and the Closing Date, then this Agreement shall be deemed null and void.  Except as otherwise provided herein, this Agreement shall be irrevocable by Buyer.

**3.**   ***Asset Sale:*** Subject to the terms and conditions set forth herein, on the Closing Date, Buyer shall remit the Purchase Price to Seller, and Seller shall sell, assign, transfer, convey, and deliver to Buyer, and Buyer shall purchase from Seller, the Acquired Assets, and all rights of any nature arising thereunder or related thereto, to Buyer, AS IS, WHERE IS, WITH ALL FAULTS, and WITHOUT RECOURSE, WARRANTY OR REPRESENTATION (except as expressly set forth herein), but (a) subject to the terms, conditions, and limitations set forth in the NASCAR Charter and the relevant provisions of the NASCAR Rule Book and (b) to the extent set forth in

# EXHIBIT A

the Sale Order, free and clear of all claims, liens, and encumbrances, with such claims, liens, and encumbrances attaching to the proceeds of the sale to the same extent, validity, and priority as existing with respect to the Acquired Assets immediately before the Closing.

**4.    Excluded Assets:** Notwithstanding any provision in this Agreement to the contrary, nothing herein shall be deemed to sell, transfer, assign, or convey the Excluded Assets to Buyer, and Seller shall retain all right, title, and interest in and to the Excluded Assets after Closing.

**5.    No Liabilities/Assumption of Liabilities:** Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created.

**6.    Transfer of the Charter:** Upon Closing, Buyer shall be deemed to accept the NASCAR Charter on an AS IS, WHERE IS basis, WITH ALL FAULTS and WITHOUT RECOURSE, WARRANTY OR REPRESENTATION (except as expressly set forth herein) and shall be deemed to have assumed, and agreed to pay, perform, and discharge, all obligations, liabilities, duties, and responsibilities as "Team Owner" under the NASCAR Charter.  Likewise, Buyer's Control Person shall, upon Closing, be deemed to have assumed, and agreed to pay, perform, and discharge, all obligations, liabilities, duties, and responsibilities as "Control Person" under the Charter.  Buyer acknowledges and agrees that NEM's consent is required for the transfer of the Charter and each Party shall execute all NEM Documents on or before the Closing Date.

**7.    Bill of Sale:** At Closing, Seller shall deliver to Buyer a duly-executed bill of sale substantially in the form appearing as <u>Exhibit D</u> attached hereto evidencing the conveyance of Seller's right, title, and interest in and to the Fixed Assets and Titled Vehicles to Buyer.

**8.    Titled Vehicles Titles:** At Closing, Seller shall deliver to Buyer original titles to each of the Titled Vehicles properly endorsed to Buyer.

**9.    Physical Possession of Tangible Assets:** At Closing, Seller shall deliver to Buyer physical possession of all of the Acquired Assets capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery.

**10.    Payment of Purchase Price:** Buyer shall pay Seller the Purchase Price as follows.

**10.1.**   Within one (1) business day of the Execution Date, Buyer shall pay the Good Faith Deposit to the Escrow Agent.  The Good Faith Deposit shall be applied to the Purchase Price at Closing or otherwise disbursed by the Escrow Agent in accordance with the provisions of this Agreement.

**10.2.**   In the event any Acquired Asset having an aggregate value of $10,000 or more is lost or destroyed prior to the Closing Date, then the Purchase Price shall be reduced by any such asset's replacement value, as mutually agreed upon by the Parties in their reasonable discretion.

**10.3.**   On the Closing Date, Buyer shall pay Seller an amount equal to the full Purchase Price, less the Good Faith Deposit (and any reduction for lost or destroyed Acquired Assets as set forth above), by wire transfer in immediately available funds to an account

designated in writing by Seller, and the Good Faith Deposit shall be delivered to Seller. Each party shall pay its own expenses, taxes, and other costs incident to or resulting from this Agreement, whether or not the transaction contemplated hereby is consummated; *provided, however*, that Buyer shall pay any Transfer Fee required to be paid to NEM pursuant to the NASCAR Charter unless NEM waives such Transfer Fee.

**10.4.**   If the Bankruptcy Court enters a sale approval order that fails to qualify as the Sale Order and Buyer is not the Back-Up Bidder identified in such order, then Seller's obligation to close the sale shall be null, void, and unenforceable, and Seller shall return the Good Faith Deposit to Buyer within three (3) business days of the entry of such order.

**10.5.**   Notwithstanding any of the foregoing to the contrary, in the event Buyer is the Back-Up Bidder and the party holding the winning bid fails to close by the corresponding deadline provided in the sale approval order, then the Closing Date shall be the tenth (10th) day after such deadline or on such earlier day mutually agreed upon by the Parties; provided that the Closing Date shall not occur after the Outside Date without Buyer's consent.

**11.   Assumption of Liabilities:**   Except as otherwise provided herein, Buyer shall assume, and Seller shall assign, Seller's rights and obligations in connection with the Assumed Liabilities. Without limiting the foregoing, Buyer shall assume at Closing all duties and obligations that remain owing and outstanding at that time by the Debtor in favor of NEM and NASCAR as set forth in the NASCAR Charter or otherwise.  Likewise, Buyer's Control Person shall assume at Closing all duties and obligations that remain owing and outstanding at that time by the Debtor's "Control Person" in favor of NEM and NASCAR as set forth in the Charter or otherwise.  With respect to the Priority Wage Claims, Buyer's obligations shall be limited as follows:  (a) at closing, $350,000.00 out of the Purchase Price shall be placed in escrow with the Escrow Agent; (b) in no event shall Buyer's obligation to satisfy the Priority Wages Claims exceed the aforementioned $350,000.00 escrow amount; (c) Seller shall bear full responsibility for obtaining a Bankruptcy Court Order determining the allowed amount of Priority Wage Claims on or before the end of the 2018 Cup Series season.

**12.   Employees:**   Effective upon the Closing, Seller shall terminate the employment of all employees of the Business to the extent such employees are offered employment with Buyer as set forth in this Section. Buyer shall offer employment, effective on the Closing Date, to employees of the Business actively employed or engaged principally in the Business as of the Closing Date for the remainder of the 2018 Cup Series season (such employees who accept such offer of employment and commence active employment with Buyer, the "Rehired Employees") on terms and conditions of employment substantially similar to those in effect with Seller immediately prior to Closing.  Buyer shall pay a retention bonus of $2,000.00 per employee (not to exceed $50,000.00 in the aggregate) to each Rehired Employee who remains employed by Buyer through the completion of the 2018 Cup Series season.  Further in recognition of the importance of the employees to the value of the Acquired Assets, it is an express condition of Buyer's offer that up to $350,000 of the Purchase Price be allocated to payment of Priority Wage Claims Nothing contained in this Agreement shall confer upon any Rehired Employee any right to any term or condition of employment or to continuance of employment by Buyer or any of Buyer's affiliates, nor shall anything herein interfere with the right of Buyer or any of Buyer's

# EXHIBIT A

affiliates to terminate the employment of any employee, including any Rehired Employee, at any time, with or without notice and for any or no reason, or restrict Buyer or any of Buyer's affiliates in modifying any of the terms or conditions of employment of any employee, including any Rehired Employee, after the Closing.  Except for the Assumed Liabilities, Seller shall be responsible for (and Seller shall indemnify and hold Buyer harmless from and against), any and all wages, bonuses, commissions, employee benefits, retention or stay bonus arrangements, and other compensation, if any, due to the employees of Seller arising out of their employment with Seller prior to and as of the Closing.

**13.    *Executory Contracts:*** With respect to any contract that is not assumed and assigned to Buyer as of the date of this Agreement, then provided that such contract has not been rejected by Seller pursuant to Section 365 of the Bankruptcy Code, upon written notice(s) from Buyer within sixty (60) days following the Closing of Buyer's desire to assume such contract, Seller shall take all actions reasonably necessary to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code any contract(s) set forth in Buyer's notice(s); provided, that any applicable cure cost shall be satisfied by Buyer.  Seller agrees and acknowledges that it shall provide Buyer with reasonable advance notice of any motion(s) to reject any contract.

**14.    *Transition Services:*** For a period of up to sixty (60) days after the Closing Date, Buyer shall have the ability to utilize any assets of Debtor that do not constitute Acquired Assets (other than cash or accounts receivables) as reasonably necessary for Buyer to operate the Business. Buyer shall reimburse Seller for any costs or expenses incurred by Seller as a result of Buyer's use of such assets.  Notwithstanding the foregoing, Seller may consummate any sales of Excluded Assets for which a motion to sell in the Bankruptcy Case:  (a) is pending as of the Execution Date; or (b) is filed after the Execution Date with the consent of Buyer.

**15.    *Sponsorship Commission:*** In the event that the Debtor enters into a Sponsorship Agreement and such Sponsorship Agreement is assigned to Buyer at Closing (it being understood that Buyer shall not be obligated to assume the obligations under any Sponsorship Agreement), then the Purchase Price will be increased by the amount of any revenue actually received by Buyer pursuant to the Sponsorship Agreement after the Closing Date with such amounts to be paid by Buyer to Seller within three (3) business days of actual receipt thereof.

**16.    *Confidentiality:*** For the avoidance of doubt, the terms and provisions of this Agreement and the negotiations and other communications between Buyer and Seller relating hereto, shall be treated as "Confidential Information" within the meaning of the NDA; *provided, however*, that (a) Seller may disclose this Agreement in connection with the filing of the motion seeking entry of the Bidding Procedures Order, (b) the Parties may disclose this Agreement at the "Competitive Sale" within the meaning of the Bidding Procedures Order or in any Bankruptcy Court hearing relating to Seller's seeking entry of the Sale Order, and (c) the Parties may disclose the terms and provisions of this Agreement to NASCAR to the extent necessary to consummate the sale.  Unless otherwise required by applicable law, the Parties shall not make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed.

**EXHIBIT A**

**17.** *Seller's Representations and Warranties:* Seller hereby represents and warrants to Buyer that the following statements are true and correct as of the date hereof.

**17.1.** No approval, consent, license, permit, waiver, or other authorization is required in connection with the execution or delivery by Seller of this Agreement, the performance of Seller's obligations under this Agreement, or the consummation of the transactions contemplated herein, except for those required from NEM under the NASCAR Charter and from the Bankruptcy Court under the Bankruptcy Code.

**17.2.** No broker, finder or other person is or shall be entitled to any commissions or finder's fees in connection with the transactions contemplated hereby by reason of any action taken by Seller.

**17.3.** No event or condition exists which does, or would with the passage of time, constitute an event of default under the NASCAR Charter. Subject to the terms and conditions of the NASCAR Charter and the applicable NASCAR Rule Book, and subject to the approval of NASCAR and the Bankruptcy Court, Seller has the power and right to assign the NASCAR Charter to Buyer, and upon such assignment, no amounts will be due and payable to NASCAR other than payment of any applicable Transfer Fee provided in the NASCAR Charter.

**17.4.** To the best of Seller's actual knowledge, the Debtor has good and marketable title to, or a valid leasehold interest in or all rights to use, all Acquired Assets, subject only to Encumbrances which shall be released from the Acquired Assets and attach to the proceeds thereof pursuant to the Sale Order. To the best of Seller's actual knowledge, subject to the entry of the Sale Order and completion of the Closing, Buyer shall have the right to use all of the Acquired Assets free and clear of any Encumbrances, except as follows:

**17.4.1.** on July 16, 2018, Seller filed in the Bankruptcy Case a *Motion for Authority to Sell Property Free & Clear of Liens—Various Personal Property* (D.E. 157) and a *Motion for Authority to Sell Property Free & Clear of Liens— 2007 Volvo Road Tractor* (D.E. 158), each of which sought Bankruptcy Court authority to sell certain of the Debtor's assets;

**17.4.2.** a CNC Machine belonging to the Debtor is subject to some sort of interest in favor of an entity called "Champion Machinery," however Seller does not have the specifics of the corresponding agreement at this time, but understands this item to be more specifically described as "1999 HAAS Model VF4, SN: 17370, HAAS Controls with an estimated value of $15,000";

**17.4.3.** there are several assets listed in the Debtor's bankruptcy schedules, each having an estimated value less than $1,000.00, that Seller has, thus far, been unable to confirm with absolute certainty the Debtor's ownership interest in.

**17.4.4.** the only assets listed in the Debtor's bankruptcy schedules having an estimated value of more than $1,000.00, that Seller has, thus far, been unable to confirm with absolute certainty the Debtor's ownership interest in are: "two (2)

# EXHIBIT A

Lyon 2-Door Cabinet with Tooling with an estimated value of $1,200.00"; "Oki Color Painter M-645 with an estimated value of $12,000.00"; "Easy Mount EM 1600 SH Wide Format Laminator with an estimated value of $4,500.00"; and "Graphtech FC8600-160 with an estimated value of $4,000.00."

**17.5.**   Upon entry of the Sale Order, Seller shall have the necessary power and authority to transfer the Acquired Assets to Buyer free and clear of any and all claims, liens, charges, encumbrances, and interests whatsoever.

**17.6.**   To the best of Seller's actual knowledge, other than the Bankruptcy Case or as identified in the schedules filed in the Bankruptcy Case, there is no claim, action, suit, proceeding, or governmental investigation of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Acquired Assets; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such action, to the best of Seller's actual knowledge.

**17.7.**   Subject to any necessary authorization from the Bankruptcy Court, Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. No other corporate or organizational proceedings on the part of Debtor or Seller are necessary to approve and authorize the execution and delivery of the Transaction Documents to which Seller is a party and the consummation of the transactions contemplated thereby. Subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents to which Seller is a party have been duly executed and delivered by Seller, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Seller after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Seller at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Seller, enforceable against Seller in accordance with their term.

**17.8.**   EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION, SELLER MAKES NO, AND NO PARTY SHALL BE ENTITLED TO RELY UPON, REPRESENTATIONS OR WARRANTIES AS TO ANY FACT OR MATTER ABOUT THE ASSETS OR SELLER, AND SELLER HEREBY DISCLAIMS ALL SUCH WARRANTIES AND REPRESENTATIONS.   THE ASSETS ARE BEING SOLD WITHOUT RECOURSE TO SELLER.  WITHOUT LIMITING THE FOREGOING, THERE IS NO WARRANTY RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT, FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, OR THE LIKE IN CONNECTION WITH THIS SALE.

**18.   Buyer's Representations and Warranties:** Buyer hereby represents and warrants to Seller that the following statements are true and correct as of the date hereof.

**EXHIBIT A**

*18.1.*   Buyer is duly organized, validly existing, and in good standing under the laws of Buyer's State of organization or incorporation.  Buyer has the legal right and authority to execute and deliver this Agreement and perform Buyer's obligations hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized, and no other proceedings or approvals on the part of Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby, and this Agreement constitutes a legal, valid, and binding obligation of Buyer.

*18.2.*   No approval, consent, license, permit, waiver or other authorization is required in connection with the execution or delivery by Buyer of this Agreement, the performance of Buyer's obligations under this Agreement, or the consummation of the transactions contemplated herein, except for those required from NEM under the NASCAR Charter.

*18.3.*   There are no legal or governmental proceedings that have been commenced by or against Buyer or, to Buyer's knowledge, that have been threatened against or may affect Buyer or any of Buyer's properties, assets, or operations, or that challenge, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, the transactions contemplated by this Agreement.  There are no court orders or directives issued by any governmental agency to which Buyer or any of Buyer's assets are subject that may adversely affect Buyer or that challenge, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, the transactions contemplated by this Agreement, or that affect the enforceability of this Agreement against Buyer or impair Buyer's ability to consummate the transactions contemplated by this Agreement.

*18.4.*   No broker, finder, or other person is or shall be entitled to any commissions or finder's fees in connection with the transactions contemplated hereby by reason of any action taken by Buyer.

*18.5.*   In connection with its decision to purchase the NASCAR Charter, Buyer acknowledges and agrees that (i) Buyer is a sophisticated party with such knowledge and experience in business matters that Buyer appreciates the merits and risks involved in purchasing the NASCAR Charter and consummating the transactions contemplated hereby, (ii) Buyer has had the opportunity to perform, to Buyer's satisfaction, any and all diligence that Buyer believes is necessary or appropriate in connection with this Agreement and the transaction contemplated herein, and (iii) Buyer has had an opportunity to review and consider the terms and provisions of this Agreement and each related document, to consult with counsel of Buyer's choice, if desired, and to suggest changes to the structure and terms of this Agreement and each related document.

*18.6.*   Buyer has no affiliation or relationship with the Debtor, any insider(s) (within the meaning of Bankruptcy Code § 101(31)) of the Debtor, or any creditor(s) of the Debtor whatsoever, other than the following:   an affiliate of Buyer is a participant in the NASCAR Camping World Truck Series and the NASCAR Xfinity Series.

## EXHIBIT A

*18.7.*   Buyer expressly acknowledges and agrees this Agreement and Seller's efforts to sell the Acquired Assets more broadly are subject to Bankruptcy Court approval and an competitive sale process through which Seller will be permitted to advocate for a sale of the Acquired Assets to a different purchaser if deemed appropriate by Seller.

**19.   *Access to Information and Facilities:*** Seller agrees that, prior to the Closing Date, Buyer and its respective representatives shall, upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of Debtor, have reasonable access during normal business hours to all facilities and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Debtor (including conducting a physical inventory of the Fixed Assets) and such examination of the books and records and financial condition of Seller as it reasonably requests and to make extracts and copies to the extent necessary.

**20.   *Conduct of Business and Maintenance of Assets:*** Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Buyer, and subject in all cases to Seller's compliance with the prohibitions and restrictions of the Bankruptcy Code or any Orders entered by the Bankruptcy Court, from the date hereof until the Closing Date, Seller shall:  (a) use commercially reasonable efforts to (i) conduct the Business of the Debtor in the ordinary course of business, (ii) preserve the present business operations, organization and goodwill of the Business, (iii) maintain the Acquired Assets in the ordinary course of business, and (iv) preserve the present relationships with persons having business dealings with the Debtor (including suppliers of the Business); and (b) take all actions necessary to maintain the NASCAR Charter.

**21.   *Notification of Certain Matters:*** Seller shall give prompt written notice to Buyer of (a) the occurrence or nonoccurrence of any event that would be likely to cause either (i) any representation or warranty of Seller contained in this Agreement, or in connection with the transactions contemplated hereunder, to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing or (ii) directly or indirectly, any material adverse effect on the Acquired Assets, or (b) any material failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.  Seller shall immediately notify Buyer as soon as Seller believes it is reasonably possible that (x) Debtor will not be able to compete in any upcoming Event (as defined in the NASCAR Charter), or (y) any event or condition has occurred, or is reasonably likely to occur, that would constitute an event of default under the NASCAR Charter (or would constitute an event of default if not cured within a specified period of time). Upon receipt of such notice, Buyer shall have the option, but not the obligation, and subject to approval of the Bankruptcy Court, if necessary, to advance funds to Seller which are reasonably necessary to avoid, or cure, any circumstance described in subparts (x) and (y) of this subsection and, in such event, the amount of any such advance shall be credited against the balance of the Purchase Price at Closing.  To the extent not already included, Seller shall add Buyer and Buyer's counsel to the "Rule 2002 notice list" and otherwise provide notice to Buyer of all matters that are required to be served on parties in interest in the Bankruptcy Case pursuant to the Bankruptcy Code and Rules.

**22.   *Bankruptcy-Related Matters:***

## EXHIBIT A

**22.1.** *Bankruptcy Actions:* Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers relating to the transactions contemplated by this Agreement prepared by (including forms of Orders and Notices to interested parties) prior to the filing thereof in the Bankruptcy Case. All motions, applications, petitions, schedules and supporting papers prepared by Seller and relating to the transactions contemplated by this Agreement to be filed on behalf of Seller after the date hereof must be reasonably satisfactory in form and substance to Buyer. Each of Buyer and Seller will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order and the Bidding Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Seller of its obligations under this Agreement and the Transaction Documents and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code. Each of Buyer and Seller will promptly take such actions as are reasonably requested by the other party to assist in obtaining any necessary consents to the consummation of the transactions contemplated by this Agreement.

**22.2.** *Other Bids:* Pursuant to the terms of the proposed Bidding Procedures Order, Seller will solicit bids from other prospective Buyers for the sale of all or substantially all of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Seller) and in accordance with the procedures set forth in the proposed Bidding Procedures Order; provided that, following completion of the Competitive Sale until the Closing, Seller shall not, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any proposal for an alternative transaction for all, or any portion of, the Acquired Assets.

**22.3.** *Other Bankruptcy Matters:* Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets and the assumption and assignment of the Assumed Liabilities are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that Seller has taken reasonable steps to obtain the highest and otherwise best offer possible for the Acquired Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court. In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related notice of appeal or Order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such Orders. From and after the Effective Date, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of Bidding Procedures Order.

**23.**   **Conditions to Closing:**

<u>**EXHIBIT A**</u>

**23.1.** *Conditions to Parties' Obligations:* The obligations of Buyer and Seller under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Buyer and Seller (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement): (a) all authorizations, consents, filings and approvals necessary to permit the parties to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance, reasonably satisfactory to the Parties, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect; and (b) no order shall be issued by and no proceeding shall be pending before any governmental authority seeking or threatening to stay, restrain or prohibit the consummation of the transactions contemplated by this Agreement.

**23.2.** *Conditions to Performance by Buyer:* The obligations of Buyer under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Buyer: (a) Seller shall make all of the representations and warranties set forth in this Agreement on and as of the Closing Date, and such representations and warranties shall be true and correct as of the Closing Date in all material respects; (b) Seller shall have performed and complied in all material respects with all its respective obligations under this Agreement which are to be performed or complied with by it prior to or at the Closing; (c) NASCAR shall have provided its consent to the assignment of the NASCAR Charter to Buyer pursuant to this Agreement; (d) the Sale Order shall approve and authorize the transactions contemplated by this Agreement, including the assumption and assignment of the NASCAR Charter, shall have been entered on the docket of the Bankruptcy Court, and shall have become a Final Order; (e) there shall not have occurred a Material Adverse Change since the date hereof; and (f) Seller shall have delivered to Buyer all of the Closing deliverables required by this Agreement. Notwithstanding any of the foregoing, Buyer (x) expressly acknowledges that Seller has disclosed in this Agreement that certain assets that would otherwise qualify as Acquired Assets are either subject to pending motions to sell in the Bankruptcy Case or potentially subject to competing interests by third parties and (y) agrees that neither the Purchase Price shall be reduced nor shall this Agreement be terminable on account of Seller's failure to deliver clear title to such assets.

**23.3.** *Conditions to Performance by Seller:* The obligations of Seller under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Seller: (a) Buyer shall make all of the representations and warranties set forth in this Agreement on and as of the Closing Date, and such representations and warranties shall be true and correct as of the Closing Date in all material respects; (b) Buyer shall have performed and complied in all material respects with all its respective obligations under this Agreement which are to be performed or complied with by it prior to or at the Closing; (c) the Bankruptcy Court shall have entered an Order approving the execution of this Agreement by Seller and the consummation by Seller of the transactions contemplated herein; and (d) Buyer shall have delivered to Seller all of the Closing deliverables required by this Agreement.

**EXHIBIT A**

*24.* ***Termination:*** This Agreement may be terminated prior to the Closing upon written notice to the non-terminating Party(ies) as follows:  (i) by mutual written agreement of the Parties at any time; (ii) in the event of a material misrepresentation in this Agreement by Buyer or Buyer's Control Person, by Seller immediately upon written notice to Buyer; (iii) in the event of a material breach of this Agreement by Buyer or Buyer's Control Person, by Seller upon Buyer's or Buyer's Control Person's failure to cure such breach after ten (10) days' advance written notice; (iv) in the event of a material breach of this Agreement by Seller, by Buyer upon Seller's failure to cure such breach after ten (10) days' advance written notice; (v) by Buyer or Seller if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated herein; (vi) automatically upon the Bankruptcy Court's entry of an order approving an Acquisition Proposal for all, or any portion of, the Acquired Assets; provided, that if in connection with such an Acquisition Proposal, the Buyer is the Back-Up Bidder (as defined in the Bidding Procedures Order), then Buyer shall not be permitted to terminate this Agreement until after the earlier of (A) the Closing of such Acquisition Proposal or (B) the Outside Date; (vii) by Buyer if the Bankruptcy Court does not enter the Bidding Procedures Order on or before August 3, 2018; (viii) by Buyer if the Bankruptcy Court does not enter the Sale Order on or before September 5, 2018; (ix) by Buyer upon the occurrence of any event or condition that would entitle NASCAR to terminate the NASCAR Charter; (x) by Buyer on any day on or after the Outside Date if the Closing shall not have occurred by such date (or by such later date as shall be mutually agreed to by Buyer and Seller in writing), unless the Closing has not occurred due to a material failure of Buyer to perform or observe its obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date; (xi) by Seller on any day on or after the Outside Date if the Closing shall not have occurred by such date (or by such later date as shall be mutually agreed to by Buyer and Seller in writing), unless the Closing has not occurred due to a material failure of Seller to perform or observe its obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date; and (xii) by Buyer if (A) the Bankruptcy Case is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code, or (B) anyone other than Seller is appointed as trustee of the Debtor's bankruptcy estate. Except as expressly set forth in this Section above, Buyer's obligations arising under this Agreement are irrevocable.

*25.* ***Breakup Fee and Return of Deposit:***  If this Agreement is terminated or the transactions hereby are not consummated for any reason other than a termination by Seller based on Buyer's material misrepresentation or material breach, then Escrow Agent shall pay the Good Faith Deposit to Buyer within three (3) business days following the date of such termination.  Within one (1) Business Day following the date Seller consummates an Acquisition Proposal, Seller shall pay to Buyer a breakup fee equal to $100,000 (the "Breakup Fee"); *provided, however*, that the Breakup Fee shall not be payable to Buyer if this Agreement has been terminated by Seller based on Buyer's material misrepresentation or material breach.  Seller's obligation to pay the Breakup Fee shall survive termination of this Agreement and shall constitute an administrative expense of Seller under Section 503(b) of the Bankruptcy Code; *provided, however*, that in no event shall Seller be obligated to pay the Breakup Fee after Closing.  If this Agreement is terminated by Seller based on Buyer's material misrepresentation or material breach, then Escrow Agent shall pay the Good Faith Deposit as liquidated damages to Seller within one (1) Business Day following the date of such termination as Seller's sole and exclusive remedy for

# EXHIBIT A

the breach by Buyer of this Agreement.  The provisions this Section shall become effective even if the transactions contemplated by this Agreement are not consummated.

**26.     *Further Assurances:*** The Parties agree to use reasonable efforts to take such further actions as may be reasonably necessary following the Closing Date to effectuate the transactions contemplated by this Agreement.  The Parties agree to execute and deliver any customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to the Parties, as may be required to give effect to this Agreement even if not specifically referenced in this Agreement.

**27.     *Notices:*** All notices permitted or required to be made under this Agreement or the Charter shall be made in writing and shall be deemed to have been given when delivered either: (a) in person, (b) by electronic mail, or (c) one (1) business day after being deposited with a nationally-recognized overnight carrier, and addressed to the address set forth for each Party in the General Provisions.  Any notice sent by other means shall be deemed operative only upon actual receipt.  A Party's address set forth in this Agreement may be changed by a Party upon ten (10) days' written notice given to all Parties sought to be charged with notice of such change. The refusal of any Party to accept delivery or the inability to deliver because of changed address of which no notice was given shall be deemed the equivalent of receipt.

**28.     *Miscellaneous:***

   ***28.1.*** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

   ***28.2.*** This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

   ***28.3.*** No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

   ***28.4.*** Seller reserves all rights, claims, and remedies (i) against all parties that are obligated to Seller on the indebtedness secured by the Acquired Assets or that have pledged any assets as collateral for such indebtedness, and (ii) with respect to any assets other than the Acquired Assets that have been pledged as collateral for such indebtedness,

## EXHIBIT A

and Seller waives no such rights, claims, or remedies, except solely with respect to the Acquired Assets as of the Closing Date.

**28.5.**   This Agreement shall bind and inure to the benefit of the Parties and their respective personal representatives, heirs, successors, and assigns.   Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by a Party without the prior written consent of the other Party.

**28.6.**   All negotiations, considerations, representations, and understandings between the Parties with respect to the subject matter of this Agreement are incorporated and merged herein.   This Agreement may be modified or altered only by agreement in writing between the Parties.   As between the Parties, this Agreement shall control in the event of any conflict between this Agreement and any of the NEM Documents.

**28.7.**   This Agreement may be signed in any number of separate copies, each of which shall be effective as an original, but all of which taken together shall constitute a single document.   An electronic transmission or other facsimile of this Agreement or any related document shall be deemed an original and shall be admissible as evidence of the document and the signer's execution.

**28.8.**   Time is of the essence with respect to the performance of the obligations under this Agreement.

**28.9.**   All representations and warranties made in this Agreement or any other document furnished in connection with this Agreement shall survive the execution, delivery, and/or termination of this Agreement and the Closing.

**28.10.**   This Agreement shall be governed by and pursuant to the internal laws of the State of North Carolina, except with respect to conflict of laws principles.   The Bankruptcy Court shall be the exclusive venue to resolve any dispute that should arise between the Parties in connection with this Agreement.

**28.11.**   Buyer hereby irrevocably consents to the personal jurisdiction of the Bankruptcy Court in any action, claim, or other proceeding arising out of any dispute in connection with this Agreement, any rights or obligations hereunder, or the performance of such rights and obligations.   Buyer hereby irrevocably consents to the service of a summons and complaint and other process in any action, claim, or proceeding brought by Seller in connection with this Agreement, any rights or obligations hereunder, or the performance of such rights and obligations, on behalf of themselves or their property, by First Class U.S. Mail, postage prepaid, delivered to Buyer at Buyer's address set forth in the General Provisions; *provided*, *however*, nothing in this Section shall affect Seller's right to serve legal process in any other manner permitted by applicable law.

**28.12.**   If legal proceedings are instituted to enforce any provision of this Agreement, the prevailing party in the proceeding shall be entitled to recover from the non-prevailing party reasonable attorneys' fees and court costs incurred in connection with the proceeding.

## EXHIBIT A

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Execution Date.

*/signature page(s) follow(s)/*

## EXHIBIT A

**SELLER:**

_____

Matthew W. Smith, as and only as the duly-appointed
chapter 11 bankruptcy trustee for BK Racing, LLC

**BUYER:**

By: _____

Printed Name: _____

Title: _____

**BUYER'S CONTROL PERSON:**

_____

Printed Name: _____

## EXHIBIT A

**EXHIBIT A**

**BIDDING PROCEDURES ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| In re:<br><br>**BK Racing, LLC**,<br><br>                                       Debtor. | Case Number:  18-30241<br><br>Chapter 11 |

**ORDER (I) APPROVING BIDDING AND SALE PROCEDURES IN CONNECTION WITH THE SALE OF CHARTER AND RELATED ASSETS, (II) APPROVING AGREEMENT WITH STALKING HORSE BIDDER, AND (III) SCHEDULING COMPETITIVE SALE AND SALE APPROVAL HEARING**

THIS MATTER came before the Court on July 24, 2018 upon the *Trustee's Amended Motion for Order (I) Approving Bidding and Sale Procedures in Connection with the Sale of Charter and Related Assets, (II) Approving Agreement with Stalking Horse Bidder, (III) Scheduling Competitive Sale and Sale Approval Hearing, and (IV) Approving Sale Free and Clear of Liens to Good Faith Purchaser* (the "Motion") (D.E. ___) following notice to all parties in interest.  One objection was filed by Race Engines Plus, LLC (D.E. 155).  Parties appearing were:  Michael Martinez on behalf of Matthew W. Smith (the "Trustee"), David M. Schilli on behalf of Union Bank & Trust; Glenn C. Thompson on behalf of Race Engines Plus, LLC, Jonathan T. Edwards on behalf of NASCAR Event Management, Inc., and Felton E. Parrish on

**EXHIBIT A**

behalf of MBR LLC.  Based upon the Motion, the record in this case, the evidence presented at the hearing and arguments of counsel, the Court is of the opinion that the relief requested in the Motion is in the best interests of the debtor, BK Racing, LLC (the "Debtor"), the Debtor's creditors, and the Debtor's bankruptcy estate, and after due deliberation and sufficient cause, finds and concludes as follows.

1.      The Debtor is in the business of operating a NASCAR-chartered, Monster Energy cup series ("Cup Series") race team.  The Debtor's right and license to participate in NASCAR-chartered events is authorized and otherwise governed by that certain *NASCAR Cup Series Charter Member Agreement* entered into by and between NASCAR Event Management, Inc. and related entities (collectively, "NASCAR") and the Debtor (the "Charter").  The Charter generally requires the Debtor to conduct a first-class operation of a stock car racing team and to otherwise participate in the Cup Series.

2.      In order to meet these Charter obligations and others, the Debtor owns substantial tangible assets, including those certain titled motor vehicles and those certain items of equipment and other fixed assets identified on Schedule B.47.1 (the "Titled Vehicles") and Schedule B.50 (the "Tangible Assets") attached to the Debtor's Schedule A/B filed in this Case (D.E. 122 at 12–36).  The Debtor's property interests further include, without limitation, various rights to payment, causes of action, and intellectual property rights.  In addition to the foregoing, the Debtor owns certain items of equipment and other assets subject to liens in favor of Champion Tire & Wheel, Inc., including two pit boxes, one tire buggy, one cook cart, the Debtor's tire inventory, and the Debtor's wheel inventory (the "Champion Assets," and together with the Charter, Tangible Assets, Titled Vehicles, and other assets (with the exception of certain payment intangibles), the "Race Team Assets").

# EXHIBIT A

3.      From the time of the Trustee's appointment until approximately mid- to late-May, the Trustee had several communications with various parties interested in purchasing the Debtor's Charter and other assets.  In more recent weeks, the Trustee has more actively marketed the Race Team Assets for sale as a going concern in an effort to maximize value for all creditors.

4.      The Trustee has received a Stalking Horse bid from MBR LLC (the "Stalking Horse"), a copy of which is attached to the Motion as Exhibit A (the "Stalking Horse Bid").  The Stalking Horse Bid generally provides as follows:  (a) the initial purchase price for the Race Team Assets shall be $1,800,000.00 (the "Initial Bid Price") with no financing contingencies; (b) if the Stalking Horse is the winning bid at the competitive sale or if no qualified bids are received, then the Stalking Horse shall close on the purchase of the Race Team Assets as soon as possible after entry of an order approving the sale, but not later than three (3) business days after such order has become a final order (the "Closing"); (c) the Stalking Horse shall offer employment to all of the Debtor's current employees  at the time of Closing and shall pay a retention bonus of up to $2,000 per employee (not to exceed $50,000 in the aggregate) to each employee who remains employed through the completion of the 2018 Cup Series season; (d) the Stalking Horse shall assume and satisfy the priority wage claims of the Debtor's current employees up to a maximum of $350,000.00; (e) after the Closing, the Stalking Horse shall reimburse the Debtor for any revenue actually received by the Stalking Horse resulting from any sponsorship agreement that is (i) developed and otherwise secured by the Trustee and (ii) consented to by the Stalking Horse, which consent shall not be unreasonably withheld; (f) if the Stalking Horse is not the winning bidder at the competitive sale, then the Trustee shall pay the Stalking Horse a breakup fee in the amount of $100,000.00 (the "Breakup Fee") contemporaneously with the Closing; (g) any Qualified Bid (defined below) must propose a

# EXHIBIT A

purchase price that exceeds the Initial Bid Price by at least $300,000.00; and (h) the Stalking Horse shall make a good faith deposit in an amount equal to 10% of the Initial Bid Price.

5.    The Stalking Horse is neither an "insider" of the Debtor within the meaning of 11 U.S.C. § 101(31) nor otherwise affiliated or related to the Debtor.

6.    The Trustee believes that agreeing to the terms of the Stalking Horse Bid will compel potential purchasers to come forward and will otherwise generate additional interest in the Race Team Assets reasonably likely to facilitate an effective competitive sale of the Race Team Assets.

7.    The Bidding  and Sale Procedures shall be as follows:

(a)    The Trustee shall have a marketing period following entry of this Order and ending on August 13, 2018 (the "Bid Deadline") to solicit additional offers for the Race Team Assets.

(b)    Any person(s) or entity(ies) wishing to participate in the Competitive Sale (defined below) process shall deliver as soon as reasonably possible a properly and validly executed *Confidentiality and Non-Disclosure Agreement* in the form attached to the Motion as Exhibit B (an "NDA") to: Matthew W. Smith, BK Racing Trustee, 212 S. Tryon St., Ste. 1050, Charlotte, NC 28202, matt@finleygroup.com.

(c)    Immediately upon receipt of an NDA, the Trustee shall endeavor to determine whether an interested purchaser qualifies to participate in the Competitive Sale (a "Qualified Bidder"). The Trustee shall retain complete discretion to determine whether an interested person or entity is a Qualified Bidder.  At a minimum, a Qualified Bidder will have the following characteristics:

(i)    the financial wherewithal to consummate the proposed transaction, including the willingness to provide detailed financial information to the Trustee to verify such financial wherewithal; and

(ii)    the ability to qualify as a "NASCAR-Approved Bidder" (defined below).

(d)    Once the Trustee is satisfied that an interested purchaser otherwise qualifies as a Qualified Bidder, the Trustee shall provide information to, and otherwise confer with, NASCAR to determine whether the interested purchaser has the ability to satisfy (i) all of the "Team Owner" duties and

## EXHIBIT A

obligations and any other requirements of the Charter and (ii) any and all ownership structure requirements, affiliation limitations, and other NASCAR-implemented rules relating to qualified team owners appearing in the NASCAR Rule Book or otherwise (a "NASCAR-Approved Bidder"). NASCAR shall retain complete discretion to determine whether an interested person or entity is a NASCAR-Approved Bidder. In the event an otherwise Qualified Bidder becomes a "Prohibited Person" within the meaning of the Charter or otherwise loses the bidder's status as a NASCAR-Approved Bidder at any time during this process, then such bidder shall immediately cease being a Qualified Bidder and shall be disqualified from participating in the Competitive Sale.

(e)    The Trustee shall endeavor to notify any person or entity who has delivered an NDA regarding whether or not the person or entity has been approved as a Qualified Bidder within one (1) business day following the date upon which both the Trustee and NASCAR have approved such person or entity as a Qualified Bidder and NASCAR-Approved Bidder, respectively.

(f)    If a Qualified Bid (defined below) is received on or before the Bid Deadline, then the Trustee shall conduct a competitive sale of the Race Team Assets (the "Competitive Sale") pursuant to these Bidding and Sale Procedures on Monday, August 20, 2018, at 9:30 A.M. in the offices of Grier Furr & Crisp, PA located at 101 North Tryon Street, Suite 1240, Charlotte, North Carolina, or in such other location as the Trustee designates upon advance written notice to holders of Qualified Bids (the "Sale Location").

(g)    In order to attend the Competitive Sale, a Qualified Bidder must deliver, on or before the Bid Deadline, (i) an executed *Asset Purchase Agreement* in a form substantially similar to that appearing as attached Exhibit C (an "APA") and (ii) either a version of the executed APA marked to show the changes against the APA attached to the Motion as Exhibit C or an electronic version in Word of the executed APA to: Matthew W. Smith, BK Racing Trustee, 212 S. Tryon St., Ste. 1050, Charlotte, NC 28202, matt@finleygroup.com.

(h)    The Trustee shall retain complete discretion to determine whether any APA submitted qualifies a Qualified Bidder to participate in the Competitive Sale (a "Qualified Bid"). At a minimum, a Qualified Bid must have the following characteristics, unless otherwise ordered by the Court:

(i)    is timely submitted on or before the Bid Deadline;

(ii)    proposes a purchase price that exceeds the total consideration to be paid by the Stalking Horse at Closing by at least $300,000.00;

# EXHIBIT A

(iii)     makes adequate representations and warranties regarding the Qualified Bidder's affiliation or relationship with the Debtor, any insider(s) of the Debtor, or any creditor(s) of the Debtor;

(iv)     requires the Qualified Bidder to make a good faith deposit in an amount equal to ten percent (10%) of the total consideration to be paid for the assets to be purchased by the Qualified Bidder;

(v)     warrants that it is not subject to any additional due diligence, any financing contingency(ies), or any further board or similar corporate approval;

(vi)     provides that it is irrevocable by the Qualified Bidder until three (3) days after a Court order approving a sale of the assets pursuant to which the Qualified Bidder does not hold the "Winning Bid" or "Back-Up Bid" (each defined below);

(vii)     commits to a closing on the purchase as soon as possible after entry of an order approving the sale, but not later than three (3) business days after such order has become a final order (the "Closing");

(viii)     acknowledges that the sale is "as-is, where-is" with no warranties express or implied by the Trustee, other than a warranty that the Trustee has done nothing to impair title and will defend title against the lawful claims of all persons claiming by, under, or through the Trustee;

(ix)     represents and warrants to the Trustee that the Qualified Bidder (A) has relied solely upon the Qualified Bidder's own independent review, investigation, and/or inspection of the assets in making the bid and (B) did not rely upon any written or oral statements, representations, promises, warranties, or guarantees whatsoever, whether express, implied, by operation of law or otherwise, by the Trustee regarding the assets;

(x)     includes no breakup fee, expense reimbursement, or similar payment obligation burdening the Trustee;

(xi)     must be on substantially similar terms as, or better terms than, the APA and must provide for the purchase of all of the Race Team Assets; and

(xii)     must allocate the proposed purchase price among the Charter, Tangible Assets, Titled Vehicles, and Champion Assets (as those terms are defined in the Motion).

## EXHIBIT A

(i)     The Stalking Horse Bid is automatically deemed to be a Qualified Bid presented by a Qualified Bidder, and the Stalking Horse shall be entitled to credit bid the Breakup Fee at the Competitive Sale.

(j)     All due diligence shall be completed prior to the Bid Deadline, such that all bids at the Competitive Sale will be free of all contingencies other than the Court's approval of the sale free and clear of liens, with any liens transferring to the sale proceeds.  Subject to execution of the NDA, the Trustee shall provide potential bidders with any and all documents requested prior to the Bid Deadline that are in the Trustee's possession or are readily available to the Trustee.  The Trustee shall not be obligated to furnish access to any information of any kind whatsoever regarding the Race Team Assets after the Bid Deadline.

(k)     After a Qualified Bidder submits an APA, the Trustee may, in the Trustee's complete discretion, communicate with the Qualified Bidder and request any additional information deemed necessary to evaluate whether the bid should be accepted as a Qualified Bid.

(l)     The Trustee will send, on or before August 16, 2018, a written Competitive Sale invitation to all Qualified Bidders who have submitted a Qualified Bid.  The Trustee shall disclose all Qualified Bids to the Stalking Horse.

(m)    If no Qualified Bids other than the Stalking Horse Bid are received, then the Trustee will seek Court approval of the sale to the Stalking Horse pursuant to § 363 of the Code at a hearing prior to August 21, 2018, subject to the Court's availability.

(n)     If any additional Qualified Bids are received, then the Trustee shall conduct the Competitive Sale on August 20, 2018 at the Sale Location.

(o)     Except as otherwise provided herein, only Qualified Bidders submitting Qualified Bids and the Stalking Horse are eligible to participate in and attend the Competitive Sale.  All Qualified Bidders wishing to bid at the Competitive Sale shall appear and participate at the Competitive Sale— either in person or telephonically—through a duly authorized representative.  On or before August 17, 2018, all holders of Qualified Bids shall notify the Trustee in writing of the name and relationship to the Qualified Bidder of any representative who will appear at the Competitive Sale on the Qualified Bidder's behalf and a certification that the identified representative(s) will have the full authority to bid at the Competitive Sale on behalf of the Qualified Bidder, *provided, however*, that the Trustee will have the ability to exclude any identified representative that the Trustee reasonably believes would be disruptive to the Competitive Sale process.

(p)     Other than Qualified Bidders and their representatives, the only parties permitted to attend the Competitive Sale are UBT and UBT's counsel,

# EXHIBIT A

NASCAR and NASCAR's counsel, the IRS and the IRS's counsel, and the Trustee and the Trustee's counsel.

(q)   Prior to the Competitive Sale, the Trustee shall, after consulting with UBT and the IRS, select the Qualified Bid that, in the Trustee's complete discretion, reflects the highest or otherwise best value for the Race Team Assets as the Competitive Sale's opening bid. The Trustee shall then commence the Competitive Sale by announcing the opening bid. Thereafter, Competitive Sale participants may submit bids that are higher and better than a prior bid in increments of at least $50,000.00 until the Trustee selects a successful bid; *provided, however*, that the Trustee shall retain complete discretion to adjust the overbid increments upward or downward during the Competitive Sale.

(r)   The Trustee may adjourn the Competitive Sale and/or adopt supplemental Competitive Sale rules or procedures in order to facilitate a more effective Competitive Sale.

(s)   After consultation with UBT and the IRS, the Trustee shall select the successful bid (the "Winning Bid") and a back-up bid (the "Back-Up Bid") during the Competitive Sale and conclude the Competitive Sale by announcing the Winning Bid, and the holder thereof (the "Winning Bidder"), and a Back-Up Bid, and the holder thereof (the "Back-Up Bidder").

(t)   Subject to the Court's availability, the Court will conduct a hearing to consider whether to approve the sale pursuant to § 363 of the Code on Tuesday, August 21, 2018, at 9:30 A.M. in Bankruptcy Courtroom 1-4 in the United States Courthouse, 401 West Trade Street, Charlotte, North Carolina, unless the Competitive Sale has been adjourned to a later date and time. Any objections to the sale of the Race Team Assets other than any objection based on the Winning Bid amount or based on any other conduct of the Competitive Sale shall be filed with the Court on or before August 13, 2018.

(u)   If the Court approves a sale based on the Winning Bid, then the Winning Bidder shall close on the purchase no later than three (3) business days following the sale order becoming a final, non-appealable order, with the understanding that the Winning Bidder and the Trustee shall make all reasonable efforts, but not be required, to consummate the sale on or before the tenth (10th) day following entry of an order approving the sale. If the Winning Bidder fails to consummate the purchase, then the Back-Up Bidder shall close on the purchase no later than twenty (20) days after entry of an order approving the sale becoming a final, non-appealable order.

(v)   Whichever of the Winning Bidder and Back-Up Bidder actually completes the purchase of the Race Team Assets shall have sixty (60) days following

# EXHIBIT A

the Closing to notify the Trustee of any executory contracts such purchaser wishes to assume in connection with the purchase, and the Trustee shall take all actions reasonably necessary to assume and assign said contracts pursuant to § 365 of the Code.

8.    The Trustee shall have the express right to determine whether any bid is a Qualified Bid and whether any Qualified Bid is the Winning Bid or Back-up Bid. The Trustee expressly reserves the right to seek all available damages from the Winning Bidder or the Back-Up Bidder if such bidder wrongfully fails to consummate the purchase pursuant to these Bidding and Sale Procedures, except as otherwise agreed by the Trustee.

9.    The Trustee has demonstrated sound business justification for this Court to grant the relief requested in the Motion. The Court, therefore, hereby approves: (a) the Bidding and Sale Procedures with regard to the sale of the Race Team Assets and the authorization of the Trustee's engagement in conduct necessary to carry out the Bidding and Sale Procedures, (b) the Stalking Horse Bid, including, without limitation, the Breakup Fee; and (c) the form and manner of the Sale Notice attached to the Motion (the "Sale Notice").

10.    The Bidding and Sale Procedures set forth above are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Race Team Assets. The form and manner of the Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Race Team Assets, the Bidding and Sale Procedures, the Competitive Sale, and the Sale Approval Hearing, and no other or further notice is required.

11.    The sale approval hearing shall be held on **August 21, 2018 at 9:30 A.M.** in Bankruptcy Courtroom 1-4 in the United States Courthouse, 401 West Trade Street, Charlotte, North Carolina, whereby the Court will consider whether:

(a)    to authorize the sale of the Race Team Assets free and clear of all liens, with any liens transferring to the proceeds of the sale to the same extent, validity,

## EXHIBIT A

and priority as existing as of the date of the sale pending further order of the Court;

(b)    the holder of the Winning Bid or Back-Up Bid is a good faith purchaser within the meaning of § 363(m) of the Code and to grant such holders all of the protections provided thereby;

(c)    to authorize the Trustee to assume the Charter; and

(d)    any cure payment is due NASCAR for Trustee's assumption of the Charter.

12.    The Trustee shall serve the Sale Notice as follows:

(a)    upon the Bankruptcy Administrator and those parties requesting notice via ECF pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure via ECF;

(b)    upon the creditor mailing matrix in this Case via U.S. mail, postage prepaid; and

(c)    upon any party interested in purchasing the assets for whom the Trustee has a valid electronic mail address by electronic mail only.

**IT IS SO ORDERED**.

**This Order has been signed electronically. The judge's signature and court's seal appear at the top of the Order.**                    **United States Bankruptcy Court**

## EXHIBIT A

## EXHIBIT B

### SCHEDULE OF FIXED ASSETS

| Item # | Description | Value |
|--------|-------------|-------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| — | **TOTAL VALUE** |  |

# EXHIBIT A

## EXHIBIT C

### SCHEDULE OF TITLED VEHICLES

| VIN | Description | Value |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| — | **TOTAL VALUE** |  |

## EXHIBIT A

### EXHIBIT D

### BILL OF SALE

FOR VALUE RECEIVED, **MATTHEW W. SMITH**, as and only as the duly-appointed chapter 11 bankruptcy trustee for BK Racing, LLC (the "Debtor") in the bankruptcy case pending as case number 18-30241 before the U.S. Bankruptcy Court for the Western District of North Carolina ("Seller") hereby grants, sells, assigns, conveys, sets over and transfers to <<<**BUYER'S NAME**>>> ("Buyer"), whose address is <<<Buyer's Address>>>, including Buyer's successors and assigns, all of Seller's right, title, and interest in and to: (1) those certain items of equipment and other fixed assets identified on Exhibit A, attached hereto and incorporated herein by reference; and (2) those certain titled motor vehicles identified on Exhibit B, attached hereto and incorporated herein by reference.

Seller makes no representations or warranties regarding the condition of any of the assets conveyed herein, it being expressly understood and agreed that Buyer has had a full opportunity to inspect said assets to Buyer's satisfaction and Buyer accepts the assets in "as is, where is" condition.

Seller covenants and warrants that Seller has not placed or suffered to be placed any presently existing liens or encumbrances on the assets conveyed herein and will warrant and defend the title to the same against the lawful claims of all persons, claiming by, through, under, or on account of Seller.

IN WITNESS WHEREOF, Seller has executed, signed, and sealed this Bill of Sale and as of August ___, 2018.


_____
Matthew W. Smith, as and only as the chapter 11 bankruptcy trustee for BK Racing, LLC


SWORN TO and subscribed before me
this _____ day of August, 2018.


_____
_____, Notary Public
My commission expires: _____

# EXHIBIT A