## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| In re:<br><br>**BK Racing, LLC**,<br><br>                     Debtor. | Case Number:  18-30241<br><br>Chapter 11 |

### **FIRST AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH TRUSTEE'S PLAN OF LIQUIDATION FOR BK RACING, LLC**

Dated:   Charlotte, North Carolina
        December ~~13~~16, 2019

GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. State Bar No. 39885)
521 E. Morehead St., Suite 440
Charlotte, NC 28202
Telephone:  (704) 375-3720

*Counsel for Matthew W. Smith, Trustee for BK Racing, LLC*

**NO REPRESENTATIONS CONCERNING THE DEBTOR, THE DEBTOR'S BUSINESS, OR FUTURE OPERATIONS, OTHER THAN THOSE SPECIFICALLY SET FORTH HEREIN, HAVE BEEN AUTHORIZED BY THE TRUSTEE.**

## I.   **INTRODUCTION AND OVERVIEW**

On February 15, 2018 (the "Petition Date"[1]), BK Racing, LLC (the "Debtor") filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code with the U.S. Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"). On March 30, 2018, the Court appointed the Trustee as the Debtor's chapter 11 trustee. The Honorable J. Craig Whitley, United States Bankruptcy Judge, has presided over this Bankruptcy Case since its inception.

The purpose of this disclosure statement (this "Disclosure Statement") is to provide each known creditor or interest holder with adequate information about the Debtor, the assets and liabilities of the Debtor, and the Plan (attached hereto as Exhibit A and incorporated herein by reference) so that creditors and interest holders may arrive at a reasonably informed decision as to whether to accept or reject the Plan.

Following a hearing on December 16, 2019, the Bankruptcy Court entered an order conditionally approving this Disclosure Statement and authorizing the Trustee to transmit the same, along with the Plan, to holders of Claims and Equity Interests. Attention is called to the fact that the Bankruptcy Court's conditional approval of this Disclosure Statement does not constitute an endorsement or recommendation by the Bankruptcy Court of the substantive provisions of the Plan nor does it indicate that the Bankruptcy Court has conducted an independent investigation of the factual and financial matters described herein.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan. No representations concerning the Debtor or the Estate are authorized by the Trustee other than as set forth herein. Any representations or inducements made to solicit your acceptance that are not contained in this Disclosure Statement should not be relied upon by you in arriving at your decision to accept or reject the Plan.

The information contained herein has not been subject to a certified audit or other independent review. Any values of the Debtor's assets and liabilities contained herein, in the Plan, or in any attachment have been estimated by the Trustee based on the Debtor's books and records, consultation with experts, appraisals, proofs of claim filed by creditors, and additional independent research conducted by the Trustee and the Trustee's advisors. Although substantial efforts have been made to be complete and accurate, the Trustee is unable to warrant or represent the full and complete accuracy of the information contained herein.

The Honorable J. Craig Whitley will hold a Confirmation Hearing in Bankruptcy Courtroom 1-4 in the United States Courthouse, 401 West Trade Street, Charlotte, North Carolina

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings prescribed in the *Trustee's Plan of Liquidation for BK Racing, LLC* dated December 13, 2019, as may be amended by the Trustee from time to time or by Bankruptcy Court order (the "Plan"). Unless the context otherwise requires, the definitions contained in the Plan shall inform the meaning of the capitalized terms used herein.

on **January 28, 2020 at 9:30 A.M. (EST)**.  At the Confirmation Hearing, the Bankruptcy Court will, among other things, consider whether the Plan is in the best interests of creditors and will review a ballot report concerning votes cast for or against the Plan.

*READ THIS DISCLOSURE STATEMENT CAREFULLY TO FIND OUT*:

1. **HOW THE PLAN WILL AFFECT YOUR CLAIMS OR INTERESTS;**

2. **WHAT RIGHTS YOU HAVE WITH RESPECT TO VOTING FOR OR AGAINST THE PLAN;**

3. **HOW AND WHEN TO VOTE FOR OR AGAINST THE PLAN; AND**

4. **WHAT RIGHTS YOU HAVE WITH RESPECT TO SUPPORTING OR OBJECTING TO THE PLAN.**

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED.  HOWEVER, THIS DISCLOSURE STATEMENT CANNOT TELL YOU EVERYTHING ABOUT YOUR RIGHTS.  YOU SHOULD CONSULT YOUR OWN LEGAL, FINANCIAL, AND TAX ADVISORS TO OBTAIN MORE SPECIFIC ADVICE ON HOW THE PLAN WILL AFFECT YOU AND WHAT IS THE BEST COURSE OF ACTION FOR YOU.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH SINCE THE DATE OF THE DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH § 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN, OR SECURITIES OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**YOUR RIGHTS ARE AFFECTED BY THIS DISCLOSURE STATEMENT AND THE PLAN.  YOU SHOULD READ THE PLAN AND THIS DISCLOSURE STATEMENT CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.  NOTHING IN THIS**

DISCLOSURE STATEMENT OR THE PLAN CONSTITUTES LEGAL ADVICE FROM
THE TRUSTEE OR THE TRUSTEE'S ATTORNEYS.

## II.    BACKGROUND

### A.    HISTORY OF THE DEBTOR

Since its inception in late 2011 or early 2012, the Debtor was primarily engaged in the business of operating a NASCAR-chartered, cup series ("Cup Series") race team. As of the Petition Date, the Debtor's right and license to participate in NASCAR-chartered events was authorized and otherwise governed by that certain *NASCAR Cup Series Charter Member Agreement* entered into by and between NASCAR Event Management, Inc. and related entities (collectively, "NASCAR"), Ronald C. Devine, as the "Control Person" ("Devine"), and the Debtor, as the "Team Owner," which document was assigned charter member agreement number 32 (the "Charter"). Although the Debtor's business model and cost structure required the Debtor to maintain significant and continuous sponsorships, the Debtor struggled with maintaining sufficient levels of sponsorships.

### B.    EVENTS LEADING TO BANKRUPTCY FILING

The Debtor not only failed to adequately service its long-term debt obligations but also struggled to routinely pay its employees and a necessary amount of payroll tax obligations. Indeed, in the months prior to the Petition Date, the North Carolina Department of Revenue and the U.S. Department of the Treasury through the Internal Revenue Service (the "IRS") began taking aggressive levy, garnishment, and other collection measures directed at certain of the Debtor's vehicles and racing revenue, respectively.

In addition, the Debtor's engine provider, Race Engines Plus, LLC ("REP"), within sixty (60) days prior to the Petition Date, filed a civil complaint against the Debtor in state court, seeking at least $350,000.00 in damages. REP also wrote a letter to NASCAR shortly before the first race of the season in Daytona, which essentially instructed NASCAR not to allow the Debtor to race at Daytona without REP's advance approval.

Furthermore, the Debtor's primary lender, Atlantic Union Bank, f/k/a/ Union Bank and Trust ("AUB"), had also filed a state court action against the Debtor, in which AUB sought emergency pre-judgment relief, most notably the appointment of the Trustee's firm—The Finley Group, Inc. ("Finley")—as a receiver over the Debtor's assets.

### C.    OVERVIEW OF THE DEBTOR'S ASSETS

The Debtor's primary asset, and the greatest source of value for the Estate, was the Charter. The Charter generally requires the Debtor to operate a stock car racing team and to participate in the Cup Series. In order to meet these Charter obligations and others, the Debtor owned substantial tangible assets, including those certain titled motor vehicles and those certain items of equipment and other fixed assets identified on Schedule B.47.1 (the "Titled Vehicles") and Schedule B.50 (the "Tangible Assets") attached to the Debtor's Schedule A/B filed in this Bankruptcy Case (D.E. 122 at 12–36), respectively. To the Trustee's actual knowledge, other than

4

the aforementioned tangible assets that have now been sold pursuant to orders entered by the Bankruptcy Court, the only other Estate assets are Avoidance Actions against third parties.

### D.   OVERVIEW OF THE DEBTOR'S LIABILITIES

AUB submitted claims against the Estate totaling $9,475,708.52, all or substantially all of which was purportedly secured by all of the Debtor's assets other than the Titled Vehicles on the Petition Date.  The IRS asserts a $1,036,459.47 secured claim, a $1,378,918.35 priority claim, and a $385,349.82 general unsecured claim against the Estate.  The IRS contends that the IRS held a first priority security interest on the Petition Date against the Titled Vehicles, the Charter, and possibly some of the Tangible Assets.  There are $356,171 in Allowed Priority Wage Claims in this Bankruptcy Case.  The total amount of general unsecured claims made in this Bankruptcy Case exceed $16,500,000.

### E.   THE DEBTOR'S BANKRUPTCY CASE

#### 1.   Appointment of the Trustee

On March 9, 2018 (*i.e.*, twenty-two (22) days after the Petition Date), AUB filed a motion with the Court seeking to appoint the Trustee as the Debtor's chapter 11 trustee (D.E. 57).  The IRS did not oppose the appointment of the Trustee.  Neither the IRS nor AUB sought relief from the automatic stay to pursue their otherwise applicable collection remedies outside of this Bankruptcy Case.  No party in interest has meaningfully sought dismissal or conversion of this Bankruptcy Case.  On March 30, 2018, the Court entered an Order appointing the Trustee (D.E. 87).  On April 3, 2018, the Court entered an Order authorizing the Trustee to retain Finley as financial advisors to the Trustee in this Bankruptcy Case (D.E. 94).  On April 27, 2018, the Court entered an Order authorizing the Trustee to retain Grier Wright Martinez, PA ("Grier") as attorneys to the Trustee in this Bankruptcy Case (D.E. 119).  Pursuant to the pending Finley Fee App, the Trustee contends that Finley is due $221,159.28 for fees and expenses incurred in connection with this Bankruptcy Case prior to the sale of the Charter.  Grier has previously been allowed $166,458.73 in fees and expenses incurred in connection with this Bankruptcy prior to the sale of the Charter.  Upon the Effective Date, the Trustee will be presumptively entitled to a statutory commission in the approximate amount of $168,000 based upon the amount of disbursements made while the Trustee was operating the Debtor's race team and the disbursements to be made upon confirmation of the Plan.

#### 2.   Efforts to Preserve the Secured Creditors' Collateral

Pursuant to the Charter, the Debtor's failure to meaningfully compete at each and every weekly Cup Series race risked the total revocation of the Charter (*i.e.*, a substantial diminution in the secured creditors' collateral).  Therefore, the Trustee needed to ensure that the Debtor's operations were sufficient to get the team to the track each week.  In addition to maintaining the Debtor's operations, the Trustee needed to ensure that all obligations of the Estate pursuant to the Bankruptcy Code and Bankruptcy Rules were satisfied in order to avoid a dismissal or conversion of the Bankruptcy Case, the consequence of which—including delay and at least temporary lack of direction—would have risked a substantial default under the Charter.  The Trustee operated the

Debtor's race team using the cash collateral of the IRS and AUB pursuant to orders entered by the Bankruptcy Court.

### 3.    Liquidation of Assets

In August 2018, the Trustee obtained the Court's approval of procedures for selling the Charter and certain related assets (collectively, the "Race Team Assets") pursuant to the *Order (I) Approving Bidding and Sale Procedures in Connection with the Sale of Charter and Related Assets, (II) Approving Agreement with Stalking Horse Bidder, and (III) Scheduling Competitive Sale and Sale Approval Hearing* (D.E. 172), as amended by the *Supplemental Order Amending Sale Procedures* (D.E. 181).  On August 24, 2018, the Court entered an *Order Approving Sale of Race Team Assets* (D.E. 191), which, *inter alia*, authorized the Trustee:  (a) to sell the Race Team Assets to Front Row Motorsport, Inc. ("FRM"); (b) to sell additional tangible assets not purchased by FRM to Obaika Racing, LLC (the "Obaika Assets"); and (c) to sell a 2007 Volvo tractor to Rick Ware Racing, LLC (the "Volvo Tractor").  The closing on the sale of the Race Team Assets to FRM occurred on August 27, 2018 (the "Closing").  The sale of the Race Team Assets generated $1,936,954 in net proceeds.  The sale of the Obaika Assets generated $265,000 in net proceeds. The sale of the Volvo Tractor generated $26,053 in net proceeds.  As of date of filing the Plan, the Trustee had $124,925 in other cash available in the Estate's deposit account.  In sum, there is approximately **$2,352,932** currently available to disburse pursuant to the Plan.[2]

Various creditors assert purportedly valid, enforceable, and perfected security interests in the proceeds of all of the Estate's assets liquidated by the Trustee, with the exception of the Titled Vehicles, against which only the IRS asserts a secured claim.  The purchasers of the Titled Vehicles assigned purchase prices to the Titled Vehicles totaling $326,053, in the aggregate.  Iron Horse Auction Company, Inc., a professional auctioneering and appraisal firm retained by the Trustee in this Bankruptcy Case, estimated the values of the Titled Vehicles to total $576,000, in the aggregate.

### F.    COMPETING LIEN POSITIONS

The IRS asserts a Claim in this Bankruptcy Case that is partially secured by purportedly all of the Estate's assets.  The IRS perfected any lien that it might have against the Debtor's assets by filing notices of tax lien pursuant to Treasury Regulation 26 C.F.R. § 301.6323(f)-1.  The secured portion of the IRS's Claim is based upon unpaid employment taxes, penalties, and interest allegedly owed by the Debtor.  AUB asserts Claims in this Bankruptcy Case that are partially secured by purportedly all of the Estate's assets other than the proceeds generated from the sale of the Titled Vehicles.  Presumably, the secured amount of AUB's Claims would equal the total value of all Estate assets less any superior secured claim amounts held by the IRS and less the appropriate value of the Titled Vehicles.  The total amount of AUB's Claims, as alleged, exceeds $9,000,000.  Devine—the Debtor's "Control Person" with respect to the Charter and an indirect, beneficial owner of an equity interest in the Debtor—and/or entities affiliated with Devine, primarily Virginia Racers Group, LLC, assert secured claims against the Estate in an amount equal

---

[2]        The $2,352,932 figure does not include a reduction for a $200,000.00 Professional Fee Advance that was made pursuant to the *Consent Order Authorizing Trustee to Use Cash Collateral as Advance on Professional Fees and Expenses* entered in the Bankruptcy Case on October 1, 2019 (D.E. 340).

to, or exceeding, $15,000,000.  Any secured claims in favor of Devine and/or entities affiliated with Devine would be wholly subordinate to the secured claims of the IRS and AUB.[3]

The current iteration of the IRS's Secured Claim asserts that the IRS perfected its liens by filing certain notices of tax lien in the central filing office in Virginia.[4]  A substantial unresolved question in this Bankruptcy Case is whether the IRS's filings in Virginia were effective to perfect its tax liens, and that question is a highly fact-intensive inquiry for which no clear answer is apparent.  Regardless of whether Virginia was the proper jurisdiction for the IRS to perfect its tax liens, the IRS and AUB have claims likely secured by all of the proceeds of the Trustee's liquidation of the Debtor's assets.

### G.  SURCHARGE

Pursuant to § 506(c) of the Bankruptcy Code, a trustee may "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."  The Trustee contends that all, or substantially all, of the Trustee's activities—through Finley, Grier, or otherwise—between the period beginning with the Trustee's appointment and ending at the Closing, were devoted to protecting the value, and disposing, of the Charter and other collateral of the secured creditors.  The Trustee believes the total surcharge amount equals at least $582,000, as set forth in more detail in the Trustee's *Motion for Recovery of Costs Incurred in Preserving and Disposing of Collateral* (D.E. 336) filed on September 5, 2019.

### III.    SUMMARY OF THE PLAN

**THE FOLLOWING IS A BRIEF STATEMENT OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES.  CREDITORS ARE URGED TO READ THE PLAN IN FULL.  THE TERMS, CONDITIONS, AND PROVISIONS OF THE PLAN CONTROL IN ALL CASES OF AN INCONSISTENCY WITH THE SUMMARY SET FORTH IN THIS DISCLOSURE STATEMENT.  CREDITORS ARE FURTHER URGED TO CONSULT WITH COUNSEL IN ORDER TO FULLY UNDERSTAND THE PLAN.  THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING CONTRACT BY THE DEBTOR, AND AN INTELLIGENT JUDGMENT CONCERNING SUCH A PLAN CANNOT BE MADE WITHOUT UNDERSTANDING IT.  A COPY OF THE PLAN IS ATTACHED HERETO, TO WHICH REFERENCE IS HEREBY MADE FOR A MORE COMPLETE AND ACCURATE STATEMENT OF THE TERMS, CONDITIONS, AND PROVISIONS THEREOF**.

---

[3]     Earlier in the Bankruptcy Case, the Trustee also succeeded in avoiding a security interest asserted against the Charter and other property of the Estate by Ron Ingalls through the adversary proceeding captioned *Smith v. Ingalls (In re BK Racing, LLC)*, case no. 18-3050 (Bankr. W.D.N.C.).

[4]     The IRS also filed notices of tax lien in North Carolina, but the corresponding amounts only add up to $730,359.69, in the aggregate.

## A.   GENERAL PLAN CONCEPT

The Plan is a liquidating plan pursuant to which the Trustee proposes the following general division of the Effective Date Funds in accordance with a tentative settlement of various disputes between the Trustee, the IRS, and AUB, including without limitation, the competing lien positions between the IRS and AUB, the Surcharge Motion, and the Finley Fee App:.

- $450,000.00 will be paid to the IRS on the Effective Date (in addition to the IRS receiving an $86,000.00 New IRS Lien);

- $1,175,000.00 will be paid to AUB on the Effective Date;

- $75,000.00 will be escrowed for a Litigation Reserve;

- no more than $178,085.50 will be paid to holders of Allowed Priority Wage Claims;

- no more than $275,000.00[5] in the aggregate will be paid to Finley and the Trustee in partial satisfaction of whatever portion of the Finley Fee App and an application for an interim trustee commission that the Court may allow;

- no more than $125,000.00 to Grier in partial satisfaction of fees and expenses previously approved by the Court; and

- the remaining funds (approximately $75,000) will be used to satisfy administrative expenses incurred by the Estate other than (i) fees and expenses incurred by Grier or Finley prior to the closing of the sale of the Charter and (ii) any interim commission approved for the Trustee contemporaneously with confirmation of the Plan.

The remaining Estate assets—primarily Avoidance Actions—will vest in the Reorganized Debtor, which will pursue Avoidance Actions and distribute recoveries:  (a) first, to satisfy administrative expenses incurred by the Reorganized Debtor in pursuing the Avoidance Actions; (b) second, 50% of recoveries thereafter will be used to satisfy the New IRS Lien up to $86,000.00 and 50% of recoveries will be used to satisfy Deferred Administrative Claims; (c) third, once the New IRS Lien has been satisfied in full, to satisfy remaining Deferred Administrative Claims; (d) fourth, to satisfy Allowed Priority Wage Claims; (e) fifth, to satisfy Allowed Priority Tax Claims, and (f) sixth, to satisfy Allowed General Unsecured Claims.  Holders of Equity Interests in the Debtor as of the Petition Date will not receive or retain any property through the Plan.

## B.   WITHDRAWAL OF THE SURCHARGE MOTION

In exchange for the above-described carve-out from the collateral of the IRS and/or AUB: (a) the Trustee shall withdraw the Surcharge Motion with prejudice on or before the Effective

---

[5]     Pursuant to the *Consent Order Authorizing Trustee to Use Cash Collateral as Advance on Professional Fees and Expenses* entered in the Bankruptcy Case on October 1, 2019 (D.E. 340), $100,000 of the Sale Proceeds was paid to Grier in partial satisfaction of fees previously allowed by the Court and $100,000 was paid to Finley as an advance toward any portion of the Finley Fee App that may ultimately be allowed by the Court.  The $275,000 (for Finley) and $125,000 (for Grier) figures listed above include these advances.

Date; and (b) as of the Effective Date, the Trustee, Finley, and Grier shall be deemed to have waived any and all rights and claims for a further carve-out or surcharge under § 506(~~C~~c) of the Bankruptcy Code from the collateral of the IRS and/or AUB.

### C.  COMPENSATION TO THE TRUSTEE AND FINLEY

In exchange for the treatment afforded through this Plan, neither AUB nor the IRS shall oppose the Trustee receiving an interim statutory trustee commission as may be allowed by the Court pursuant to § 326(a) of the Bankruptcy Code in the amount of approximately $168,000, which amount is calculated upon all amounts disbursed following his appointment through the Effective Date.  In addition, neither the Bank nor the IRS shall oppose the Court's allowance of the Finley Fee App; *provided, however*, that Finley—having already received a $100,000.00 Professional Fee Advance—may only be paid on the Effective Date the difference between $175,000 and whatever amount is paid to the Trustee on the Effective Date on account of an allowed interim statutory commission.  Furthermore, Finley may file with the Court a written application seeking approval of compensation for the actual time spent on this case for the time period beginning September 1, 2018 and ending on the Confirmation Date at Finley's customary hourly rates without any obligation to categorize entries as "trustee time" or "financial advisor time"; *provided* that all of the rights of the Bankruptcy Administrator, AUB, and all other parties in interest to object to or otherwise contest the reasonableness or necessity of any such fees and expenses (including, without limitation, any objection on the basis that such fees and expenses were incurred in connection with the defense of the fees, expenses, and commissions sought by the Trustee, Finley, and/or Grier in the Bankruptcy Case) are expressly reserved and not otherwise, limited, impaired, or prejudiced.  For the avoidance of doubt, any amount the Bankruptcy Court awards to Finley for the actual time spent on this case for the time period beginning on September 1, 2018 and ending on the Confirmation Date shall be a Deferred Administrative Claim.

### D.  CLASSIFICATION AND TREATMENT OF CLAIMS

The Plan divides the Claims against, and Equity Interests in, the Debtor into various Classes.  Below is a general description of:  (a) the Classes (including the anticipated allowed amount of Claims in each Class), (b) each Class's proposed treatment under the Plan; and (c) the estimated recovery for each Class.  All amounts listed for each Class are estimates and are subject to change for various reasons, including determinations made by the Bankruptcy Court in the claims review process.

| CLASS DESCRIPTION AND ANTICIPATED ALLOWED CLAIM AMOUNT | DESCRIPTION OF PROPOSED TREATMENT UNDER THE PLAN | ESTIMATED RECOVERY |
|---|---|---|
| *Allowed Administrative Claims*<br><br>Includes costs and expenses of administering the Estate allowed under § 507(a)(1).<br><br>Estimated amount of unpaid Allowed Administrative Claims on Confirmation Date: $1,030,000. | *Not Classified Under the Plan; Unimpaired Under the Plan*<br><br>Each holder of an Allowed Administrative Claim shall be paid the full amount thereof in Cash as soon as practicable after the Effective Date; *provided, however*, that, to the extent such a holder agrees otherwise, payment of an Allowed Administrative Claim may be deferred. | 100% |
| *Class 1:  Allowed Priority Wage Claims* | *Impaired Under the Plan; Entitled to Vote on the Plan* | 100% |

| CLASS DESCRIPTION AND ANTICIPATED ALLOWED CLAIM AMOUNT | DESCRIPTION OF PROPOSED TREATMENT UNDER THE PLAN | ESTIMATED RECOVERY |
|---|---|---|
| Includes unsecured claims entitled to priority in payment pursuant to § 507(a)(4).<br><br>Amount of Allowed Priority Wage Claims on Confirmation Date:  $357,000. | Each holder of an Allowed Priority Wage Claim shall be paid 50% of the claim on the Plan Effective Date, plus periodic payments from Litigation Recoveries after satisfaction of all Allowed Administrative Claims until paid in full. | |
| *Class 2:  Allowed Priority Tax Claims*<br><br>Includes unsecured claims entitled to priority in payment pursuant to § 507(a)(8).<br><br>Estimated amount of Allowed Priority Tax Claims on Confirmation Date: $1,780,000. | *Impaired Under the Plan; Entitled to Vote on the Plan*<br><br>Each holder of an Allowed Priority Tax Claim shall receive periodic payments from Litigation Recoveries after satisfaction of all Allowed Priority Wage Claims until paid in full. | 4%–100% |
| *Class 3:  Allowed Secured Claims*<br><br>Includes the IRS's Secured Claim and AUB's Secured Claim.<br><br>Estimated amount of Allowed Secured Claims: Resolved through settlement. | *Impaired Under the Plan; Entitled to Vote on the Plan*<br><br>AUB will be paid $1,175,000.00 on the Effective Date in satisfaction of its Secured Claim.  The IRS will be paid $450,000.00 on the Effective Date and granted an $86,000.00 New IRS Lien against Litigation Recoveries, in satisfaction of its Secured Claim. | 100% |
| *Class 4:  Allowed General Unsecured Claims*<br><br>Includes any claim not secured by a charge against or interest in property in which the Estate has an interest, with the exception of Priority Wage Claims and Priority Tax Claims.<br><br>Estimated amount of Allowed ~~Priority Tax~~General Unsecured Claims on Confirmation Date: $17,000,000. | *Impaired Under the Plan; Entitled to Vote on the Plan*<br><br>Each holder of an Allowed General Unsecured Claim shall receive periodic payments from Litigation Recoveries after satisfaction of all Allowed Priority Tax Claims until paid in full. | 0%–7% |

Again, for a more detailed description of the terms and provisions of the Plan, please refer to the Plan itself, which is being served with this Disclosure Statement.

### E.   OTHER PLAN PROVISIONS

1.    Claims Objections and Avoidance Actions.   The Plan provides that the Reorganized Debtor shall have 120 days after the Effective Date within which to file any objections to claims against the Estate, unless the Bankruptcy Court extends that deadline.  The Reorganized Debtor will be authorized to pursue avoidance actions on behalf of the Estate.

2.    Post-Confirmation Notices.   For any of the Court filings or other notices the Reorganized Debtor is required to make after the Effective Date, the Reorganized Debtor shall provide notice thereof via email only to:  (a) the Bankruptcy Administrator; and (b) any party-in-interest that specifically requests such notice in writing from the Trustee's attorneys via email directed to mmartinez@grierlaw.com.

3.     <u>Executory Contracts</u>.  The Plan provides for the rejection of those executory contracts and unexpired leases listed in Schedule 5.2 (Rejected Agreements) attached to the Plan and any other executory contracts and unexpired leases that do not appear in Schedule 5.1 (Assumed Agreements).  If the rejection of any executory contract or unexpired lease under the Plan gives rise to a claim by a non-debtor party, such claim shall be classified as a Class 4 Claim if timely filed.  Except to the extent some other deadline is provided by order of the Bankruptcy Court, the deadline for filing claims based on the rejection of an executory contract under the Plan shall be thirty (30) days after service of any order approving such rejection.

4.     <u>Modification; Jurisdiction; Additional Provisions</u>.  The Trustee reserves the right to alter, modify, amend, revoke, or withdraw the Plan any time prior to Confirmation.  The Plan provides that the Bankruptcy Court will retain jurisdiction over the Bankruptcy Case and enforcement of the Plan.  The Plan contains numerous other provisions not expressly listed herein.  Please refer to the Plan itself for more detailed and accurate information.

5.     <u>Releases</u>.  The Plan provides for the full, complete, and absolute release by the Debtor, the Estate, the Trustee, and each of their respective predecessors, affiliates, heirs, successors, assigns, agents, and other legal representatives, in favor of AUB, the IRS, and each of their respective successors, assigns, present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, insurers, and other representatives, from any all obligations, liabilities, damages, claims, causes of action, losses, costs, expenses, and attorneys' fees, whether based in law or in equity, existing as of the Confirmation Date, whether known or unknown, contingent, or unliquidated.

## IV.     <u>ACCEPTANCE AND CONFIRMATION</u>

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan.  The Confirmation Hearing in this case will be held on **January 28, 2020 at 9:30 A.M. (EST)** in the Courtroom 1-4 on the first floor of the United States Courthouse located at 401 West Trade Street, Charlotte, North Carolina.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

At the Confirmation Hearing, the Bankruptcy Court will consider any objections to this conditionally-approved Disclosure Statement and will determine whether the requirements of § 1129 of the Bankruptcy Code have been satisfied, in which case the Bankruptcy Court will enter an Order confirming the Plan.  These requirements include determinations by the Bankruptcy Court that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan reflects the "best interests" of all allowed claimants; (iii) the Plan is feasible; (iv) the Plan has been accepted by the requisite number and amount of allowed claimants in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances; (v) the Plan and the Debtor have complied with various technical requirements of the Bankruptcy Code; (vi) the Debtor has proposed the Plan in good faith; (vii) any payments made under or promised in connection with the Plan are subject to the approval of the Bankruptcy Court as reasonable; and (viii) the Plan provides specified recoveries for certain priority claims.  The Trustee believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE DISCUSSIONS IN THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE COMPLETE SUMMARIES OF THE LAW.  IF YOU DO NOT UNDERSTAND ANY OF THESE PROVISIONS, PLEASE CONSULT WITH YOUR ATTORNEY.  IF ALL CLASSES DO NOT ACCEPT THE PLAN, THE TRUSTEE INTENDS TO RELY UPON THE "CRAMDOWN" PROVISIONS OF § 1129(b) OF THE BANKRUPTCY CODE**.

No representation concerning the Debtor or the Estate, particularly regarding the value of assets, has been authorized by the Trustee except as set forth in this Disclosure Statement.  You should not rely on any other representations or inducements offered to you to secure your acceptance of the Plan.  Any person making representations or inducements concerning acceptance or rejection of the Plan should be reported to counsel for the Trustee.  While every effort has been made to provide the most accurate information available, the Trustee is unable to warrant or represent that all information is without inaccuracy.  No known inaccuracies are set forth herein.  Further, much of the information contained herein consists of future projections.  While every effort has been made to ensure that the assumptions are valid and that the projections are as accurate as can be made under the circumstances, the Trustee has not undertaken to certify or warrant the absolute accuracy of the projections.

## A.  VOTING

Under the Bankruptcy Code, a class of claims or interests is deemed "impaired" under a chapter 11 plan unless the rights of the holders of the claims or interests of such classes are not altered, or with respect to interests, the holders receive cash equal to the greater of (a) any liquidation preference or (b) the redemption price, if either is applicable.  Any class that is deemed impaired must accept the plan by the requisite majority before the plan can be confirmed, unless the Bankruptcy Court finds, pursuant to § 1129(b) of the Bankruptcy Code, that the plan is fair and equitable and does not discriminate unfairly with respect to each class that is impaired and has not accepted the plan.  Impaired classes that receive nothing under a plan are automatically deemed to reject such plan.

Creditors holding allowed claims in Classes 1, 2, 3, and 4 are entitled to vote to accept or reject the Plan.  The Bankruptcy Court has fixed a deadline of **January 21, 2020** by which date holders of Allowed Claims must submit Ballots, either to Trustee's counsel or by filing the Ballots with the Bankruptcy Court.  Such claimants who choose not to vote, or who vote against the Plan, will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities in each Class of Allowed Claims and/or is confirmed by the Bankruptcy Court.  Holders of Allowed Claims who fail to vote will not be counted in determining acceptance or rejection of the Plan.

In order for the Plan to be accepted by any class of holders of Allowed Claims entitled to vote on the Plan, voting creditors in that Class who hold at least two-thirds (2/3) in dollar amount of voted claims in that Class and who comprise more than one-half (1/2) in total number of voting creditors in the Class must accept the Plan.  Under certain limited circumstances more fully described in § 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan by a "cramdown," notwithstanding the rejection of the Plan by one or more impaired classes of

creditors entitled to vote on the Plan.  The Trustee seeks Confirmation pursuant to § 1129(b) in the event that any Class of creditors rejects the Plan.

You may vote on the Plan by completing and mailing or emailing the enclosed Ballot to:

> BK Plan Ballots
> c/o Grier Wright Martinez, PA
> 521 E. Morehead St., Ste. 440
> Charlotte, NC 28202
> mmartinez@grierlaw.com

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.  You may NOT cast ballots or votes orally.  In order for your Ballot to be considered by the Bankruptcy Court, it must be received at the above addresses no later than the time designated in the notice accompanying this Disclosure Statement.

Pursuant to the provisions of § 1126 of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.  A holder of an Allowed Claim's failure to vote on the Plan will not affect such claimant's rights to a distribution under the Plan.

### B.   FEASIBILITY

Section 1129(a) of the Bankruptcy Code requires a judicial determination that confirmation of the Plan will not likely be followed by liquidation or the need for further financial reorganization of the Debtor unless liquidation is contemplated under the Plan.  The Trustee believes that the Plan satisfies the feasibility requirement because the Plan proposes liquidation by its own terms.

### C.   BEST INTERESTS TEST

Notwithstanding acceptance of the Plan in accordance with § 1126 of the Bankruptcy Code, the Bankruptcy Court must find, whether or not any party-in-interest objects to Confirmation of the Plan, that the Plan is in the best interests of creditors.  Bankruptcy courts have generally defined "best interests" as the Bankruptcy Code's requirement that, under any plan of reorganization, each member of an impaired class of creditors must receive or retain, on account of its claim, property of value, as of the effective date of the plan, that is not less than the amount such creditor would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Plan reflects a compromise of various related, but distinct, litigation matters between the Estate, AUB, and the IRS, including, without limitation:   litigation over which jurisdiction—North Carolina or Virginia—was the proper jurisdiction for the IRS to perfect a security interest in its tax liens on the Debtor's property; litigation over who otherwise has lien priority—AUB or IRS—including whether AUB's initial financing statement was sufficient to perfect an interest in the Charter; litigation over the validity of the IRS's lien against the Titled Vehicles; litigation over the Surcharge Motion; and litigation relating to marshaling concepts; and

litigation over the fees to be awarded Finley.  Converting this Bankruptcy Case to one under chapter 7 would renew all such litigation and create even more litigation specific to chapter 7.

~~Without even factoring in~~All of this litigation that is resolved in the Plan (but would continue to exist in a chapter 7 case) brings with it additional litigation risk to the Estate from the range of possible outcomes, appeal risks (which are very real in this Case for some of the matters that would be litigated in chapter 7), ~~all of this incremental litigation would~~ substantially ~~increase not only the~~increased costs ~~to be incurred by the Estate, but also the~~and significant delay in payments to Creditors. ~~Considering the delay, the increased costs, and other risks of liquidating in a chapter 7 setting,~~The Plan, however, is in the best interests of the creditors.  Although the priority of the liens of AUB and the IRS are in dispute, it is not contested that:  (1) all or substantially all of the property of the Estate is subject to a security interest of, either or both, AUB and the IRS; (2) the aggregate amount of the liens of AUB and the IRS far exceeds the value of the Effective Date Funds; and (3) no value currently exists for distribution to general unsecured creditors.  The Plan is the result of a settlement mediated and negotiated in good faith and at arm's length and provides meaningful recoveries to administrative and priority creditors on the Effective Date. The Plan and provides funding for the Estate to pursue additional recoveries for the benefit of the administrative, priority and general unsecured creditors after the Effective Date.  Accordingly, the Plan is in the best interest of Creditors because it provides recoveries to unsecured creditors that could otherwise recover nothing and avoids significant litigation risk, litigation costs, and litigation delay that would otherwise result if the Plan were not confirmed.  **THE TRUSTEE BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS AND STRONGLY BELIEVES THAT ALL PARTIES ENTITLED TO VOTE SHOULD CAST BALLOTS IN FAVOR              OF              ACCEPTING              THE              PLAN**.

14

### D.  CLASSIFICATION OF CLAIMS AND UNFAIR DISCRIMINATION

The Bankruptcy Code requires that a plan place each creditor's claim in a class with "substantially similar" claims.  The Trustee believes that the Plan's classification of claims complies with the requirements of the Bankruptcy Code and applicable case law.

Applicable law also forbids a plan from unfairly discriminating against creditors.  A plan does not discriminate unfairly if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive.  The Trustee believes that, pursuant to the Plan, all holders of Impaired Claims are treated in a manner that is consistent with the treatment of other holders of Claims with which any of their legal rights are intertwined.  Accordingly, the Trustee believes that the Plan does not discriminate unfairly as to any Impaired Class.

### E.  ABSOLUTE PRIORITY RULE

The condition that a plan be fair and equitable generally requires that an impaired class that has not accepted the plan must receive certain specified recoveries, as set forth in § 1129(b)(2) of the Bankruptcy Code.  Particularly, the language in § 1129(b)(2)(B)(ii) gives rise to what is commonly referred to as the "absolute priority rule."  According to the absolute priority rule, a plan is not fair and equitable as to a particular class of unsecured claims if a holder of a junior claim retains anything under the plan on account of that junior claim.  The Debtor believes that the Plan meets the thresholds specified in § 1129(b)(2) of the Bankruptcy Code for being fair and equitable to all Classes of claims.

### F.  OBJECTIONS TO CONFIRMATION

Any objections to Confirmation of the Plan must be filed with the Clerk of the United States Bankruptcy Court for the Western District of North Carolina, 401 West Trade Street, Charlotte, NC 28202, and served upon: (a) Michael L. Martinez, Grier Wright Martinez, PA, 521 E. Morehead Street, Suite 440, Charlotte, NC 28202; and (b) the United States Bankruptcy Administrator, 402 West Trade Street, Charlotte, NC 28202, in such manner as will cause such objections to be filed with the Bankruptcy Court and received by the aforementioned parties no later than **January 21, 2020 at 4:30 P.M. (EST)**.

## V.  MATERIAL UNCERTAINTIES AND RISK FACTORS

Holders of claims against the Debtor and the Estate should read and carefully consider the risk factors set forth below, as well as other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated herein by reference).  However, these risk factors should not be regarded as constituting the only risks involved in connection with the Plan and implementation thereof.

The outcome of the litigation that the Reorganized Debtor will pursue significantly impacts the ultimate treatment of claims under the Plan.  The Trustee is unable to predict with any

reasonable accuracy the Reorganized Debtor's likelihood of success on any of the claims to be asserted by the Reorganized Debtor. Similarly, the Trustee has limited information on the Reorganized Debtor's prospects of collecting on any and all judgments received through avoidance actions to be pursued by the Reorganized Debtor. Furthermore, the Trustee cannot definitively predict when such avoidance actions will be resolved.

Also, the feasibility of the Plan is predicated upon the levels of the Claims not being materially in excess of the amounts estimated herein and in the Plan. If such claims are substantially in excess of the estimated amounts, the Reorganized Debtor's ability to satisfy its payment obligations under the Plan could be impacted. Moreover, the stated amounts of claims in each Class listed above are merely estimates based on the amounts listed on the current claims register published by the Clerk of the Bankruptcy Court and the Trustee's projections regarding the amount of Claims that will be ultimately disallowed. All amounts are subject to change upon the completion of the claims review and objection process by the Reorganized Debtor.

Furthermore, the predictions and estimations underlying the Trustee's perspective of the Plan may prove to be materially inaccurate.

## VI.    POTENTIAL FOR MATERIAL FEDERAL TAX CONSEQUENCES

The Trustee makes no representation concerning the federal, foreign, state, local, and other tax consequences of the Plan except to alert all interested parties that the relevant tax issues can be complex and to urge all interested parties to consult their own tax advisors regarding the tax consequences applicable under the Plan. Implementation of the Plan may have material income tax consequences to the Debtor and the holders of claims. Nothing in the Plan or Disclosure Statement should be construed as a representation, warranty, or advice concerning such tax consequences.

## VII.    OTHER SOURCES OF INFORMATION

Additional motions, affidavits, orders, and other documentation that might be of interest to holders of claims against the Debtor in this Bankruptcy Case appear on the docket report for the Bankruptcy Case maintained by the Bankruptcy Court Clerk's Office. Copies of the docket report and corresponding documents may be obtained from the Bankruptcy Court's website at www.ncwb.uscourts.gov, or by contacting the Trustee's attorneys.

## VIII.    ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, any party-in-interest could attempt to formulate and confirm a different plan; otherwise, the property of the Estate will be liquidated under the provisions of chapter 7 of the Bankruptcy Code.

## IX.    RECOMMENDATION AND CONCLUSION

**THE TRUSTEE BELIEVES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN ARE PREFERABLE TO ANY OF THE FEASIBLE ALTERNATIVES BECAUSE THE PLAN WILL PROVIDE SUBSTANTIALLY GREATER RECOVERIES FOR THE CREDITOR BODY AS A WHOLE. ACCORDINGLY, THE TRUSTEE**

**URGES HOLDERS OF CLAIMS IN IMPAIRED CLASSES TO VOTE TO ACCEPT THE PLAN BY SO INDICATING ON THE BALLOTS AND RETURNING THE BALLOTS AS SPECIFIED OR DIRECTED ON THE BALLOTS AND IN THIS DISCLOSURE STATEMENT**.

Respectfully submitted, this ~~13~~16th day of December, 2019.

 */s/ Michael L. Martinez*
Michael L. Martinez (N.C. State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
704/375.3720 Telephone
704/332.0215 Fax
mmartinez@grierlaw.com

*Attorneys for Matthew W. Smith, Chapter 11 Bankruptcy Trustee for BK Racing, LLC*

By:      */s/ Matthew W. Smith*
Matthew W. Smith, Chapter 11 Trustee

Document comparison by Workshare Compare on Monday, December 16, 2019
4:30:56 PM

| Input: | |
|---|---|
| Document 1 ID | netdocuments://4811-0694-9026/6 |
| Description | BKR - Disclosure Statement |
| Document 2 ID | netdocuments://4843-7685-0095/1 |
| Description | BKR - First Amended Disclosure Statement |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 12 |
| Deletions | 12 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 24 |